James STRONG et al.,
Appellants-Cross-Appellees,

v.

The UNITED STATES of America,
Appellee-Cross-Appellant.

Appeal No. 1-74.

United States Court of Claims.

June 25, 1975.

558

James R. Fitzharris, Escanaba, Mich., attorney of record, for James Strong, and others, as the representatives and on behalf of all members by blood of the Chippewa Tribe of Indians, for Robert Dominic, and others, on behalf of the Ottawa Tribe of Indians, for the Shawnee Tribe of Indians of Oklahoma, and others, appellants-cross-appellees.

Robert C. Bell, Jr., New Canaan, Conn., attorney of record, for Hannahville Indian Community, and others, appellants-cross-appellees.

Rodney J. Edwards, Duluth, Minn., attorney of record, for Red Lake Band, and others, for Lawrence Zane, and oth-

ers, ex rel. Wyandot Tribe, and others, appellants-cross-appellees.

Robert S. Johnson, Topeka, Kan., attorney of record, for the Potawatomi Tribe of Indians, the Prairie Band of the Potawatomi Tribe of Indians, and others, appellants-cross-appellees.

David L. Kiley, Marion, Ind., attorney of record, for Ira Sylvester Godfroy, and others, ex. rel. the Miami Indian Tribe, appellants-cross-appellees.

Paul G. Reilly, New York City, attorney of record, for the Six Nations, appellants-cross-appellees.

Louis L. Rochmes, Washington, D. C., attorney of record, for the Delaware Tribe of Indians, for the Absentee Delaware Tribe of Oklahoma, for the Citizen Band of Potawatomi Indians of Oklahoma, appellants-cross-appellees.

Edwin A. Rothschild, Chicago, Ill., attorney of record, for the Miami Tribe of Oklahoma, appellants-cross-appellees.

Jack Joseph, Chicago, Ill., attorney of record, for the Eastern Shawnee Tribe of Oklahoma, and others, for the Peoria Tribe of Indians of Oklahoma, and others, appellants-cross-appellees.

Allan Hull, Cleveland, Ohio, attorney of record, for the Kickapoo Tribe of Oklahoma, the Kickapoo Tribe of Kansas, and others, and the Ottawa Tribe of Oklahoma, and others, appellants-cross-appellees.

Robert E. Fraley, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for the United States, appellee-cross-appellant.

Before COWEN, Chief Judge, and KUNZIG and BENNETT, Judges.

## ON APPEALS FROM THE INDIAN CLAIMS COMMISSION

COWEN, Chief Judge:

This case is before the court on numerous appeals, as well as the Government's cross-appeal, from various portions of an interlocutory decision of the Indian Claims Commission dated August 9, 1973. The consolidated proceedings below involved the determination by the Commission of title claims by various tribal claimants to an area of land identified on Royce's Map of Ohio as Area 11 (hereinafter called Royce Area 11), as well as claims of title by several appellants to certain smaller areas and rights of passage located north and west of Royce Area 11. The land with which this appeal is concerned was relinquished to defendant by the various tribes who signed the Treaty of Greeneville of August 3, 1795 (7 Stat. 49),[1] and by the Six Nations[2] who signed the treaties of October 22, 1784 (7 Stat. 15), at Fort Stanwix; of January 9, 1789 (7 Stat. 33), at Fort Harmar; and of November 11, 1794 (7 Stat. 44) at Canandaigua.

In summary, the Commission found that, except for two relatively small segments of land held "aboriginally" by the Delaware and Shawnee Tribes respectively, Royce Area 11 was not held by the ancestors of the present Indian claimants in such a manner as to require defendant to compensate them under the Indian Claims Commission Act, 60 Stat. 1049. Furthermore, the Commission determined that the appellants had no compensable interest in most of the smaller areas lying north and west of Royce Area 11. For the reasons discussed below, we hold that with one exception, the Commission's findings of fact are based on substantial evidence in the record and that its conclusions of law are correct.

### I

By far the largest area covered by the Commission's decision was Royce Area 11, consisting of approximately 18,000,-000 acres and covering two-thirds of what is today the State of Ohio and a

---

1. The following tribes were signatories of the Treaty of Greeneville: Wyandots, Delawares, Shawnees, Ottawas, Chippewas, Potawatomis, Miamis, Eel-Rivers, Weas, Kickapoos, Piankeshaws, and Kashaskias. The treaty, by its terms superseded various earlier agreements made with certain of the above tribes.

2. The Six Nations was a confederacy consisting of the Seneca, Cayuga, Oneida, Onondaga, Mohawk, and Tuscarora Nations. In these treaties the Six Nations relinquished its claims of title to the areas west of New York, which included Royce Area 11.

small contiguous area in Indiana.[3] It is, therefore, not surprising that the most vigorous and lengthy contentions of the parties deal with this territory.[4] Simply stated, the tribal appellants seek affirmance of the Commission's determinations that the Delaware and Shawnee Tribes had aboriginal title to certain portions of Royce Area 11, and reversal of the Commission's decision that in the remainder of Royce Area 11, there was no Indian title. On the other hand, the Government contends that no tribe is entitled to recover additional compensation for any portion of Royce Area 11, since none had aboriginal or recognized title. Defendant further argues that, if any title did exist at any point in time, it was extinguished. Thus, the Government seeks affirmance of the Commission's decision against claimants and a reversal of the decisions favorable to the Delaware and Shawnee in Royce Area 11, and to the Wyandot in Royce Area 20 and the unsurveyed area near Sandusky, Ohio.

The Commission's opinion and accompanying findings of fact trace in detail the history of Indian settlements in this area from 1650 through 1795, emphasizing the evolving relationships among the various tribes and between the several tribal groups and the French, the British, and the Americans. The findings demonstrate considerable thoroughness and attention to detail, and for the most part they are not questioned by the Indian appellants. As stated in the Opening Brief of Certain Appellants: "The issues in these appeals [as to Royce Area 11] involve primarily questions of principle, not of fact."

■ *Aboriginal title.* The primary "question of principle" presented in the

Indian claimants' appeals concerns the Commission's concept of "aboriginal title." Throughout its discussion of this issue, the Commission relied on past case law in determining whether claimants sufficiently proved the existence of aboriginal title at the cession date in 1795. The doctrine of aboriginal title is not new. As the court stated in *Sac & Fox Tribe v. United States,* 383 F.2d 991, 997, 179 Ct.Cl. 8, 20–21 *cert. denied,* 389 U.S. 900, 88 S.Ct. 220, 19 L.Ed.2d 217 (1967):

> [T]he right of sovereignty over discovered land was always subject to the right of use and occupancy and enjoyment of the land by Indians. This right of use and occupancy by Indians came to be known as "Indian title." It is sometimes called "original title" or "aboriginal title."

Similarly, the requirements for an Indian claimant to prove aboriginal title have been listed on numerous occasions in the past. For example, we held in *Sac & Fox Tribe v. United States,* 315 F.2d 896, 903, 161 Ct.Cl. 189, 201–02 *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963), that

> [t]o be accepted under the Indian Claims Commission Act, aboriginal title must rest on *actual, exclusive, and continuous use and occupancy "for a long time" prior to the loss of the property.* [Emphasis supplied.]

*See United States v. Santa Fe R.R.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941); *Confederated Tribes of Warm Springs Reservation v. United States,* 177 Ct.Cl. 184, 194 (1966), and cases cited therein. It was with this standard that the Commission approached its task in this case.

---

**3.** Article III of the Treaty of Greeneville drew a general boundary line between land agreed to be owned by the United States and lands agreed to be owned by the Indian signatories of the treaty. This line, called the Greeneville Treaty Line, began at the mouth of the Cuyahoga River on Lake Erie at a point where Cleveland is now located. From this point, the Line ran south approximately 70 miles to Fort Lawrence, Ohio, then to the Indian border at Fort Recovery. The Line then proceeded

southwest to a point on the Ohio River approximately 25 miles east of the Ohio State border. All lands south and east of this line, which were ceded and relinquished to the United States, were identified as Royce Area 11.

**4.** We need not decide some of the issues presented by various appellants because these issues become important only if we uphold their claim of aboriginal title, which we do not.

The obstacle facing the Indian claimants in this litigation is the requirement of "exclusiveness." Generally, mixed and non-exclusive use and occupancy of an area precludes the establishment of any aboriginal title by any of the users of the subject property. *Quapaw Tribe v. United States*, 120 F.Supp. 283, 128 Ct.Cl. 45 (1954). The purpose of this requirement is fairly obvious. In order to award compensation to the Indians for the value of land ceded to or taken by the Government, it is essential that the Commission first determine that the land in question was truly "owned" by the ancestors of the particular claimant or claimants. Certainly, one of the primary characteristics of ownership is the desire and ability to exclude others from the area over which ownership is claimed. Confronted with a similar issue recently the court stated in *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 206 Ct.Cl. —— (April 1975):

> Implicit in the concept of ownership of property is the right to exclude others. Generally speaking, a true owner of land exercises full dominion and control over it; a true owner possesses the right to expel intruders. In order for an Indian tribe to establish ownership of land by so-called Indian title, it must show that it used and occupied the land to the exclusion of other Indian groups. True ownership of land by a tribe is called in question where the historical record of the region indicates that it was inhabited, controlled or wandered over by many tribes or groups. [513 F.2d at 1394.]

"Exclusiveness" becomes a problem to plaintiffs simply because the historical record of Royce Area 11 demonstrates clearly that, with the exceptions found by the Commission, the area as a whole was "inhabited, controlled or wandered over by many tribes or groups." Indeed, claimants' own expert witnesses testified that prior to 1795 there was no exclusive use and occupancy ascertainable in the overall Royce Area 11 or in any large portion of it. Thus, without more, it would seem that the appeals grounded on claims of aboriginal title must be denied. Faced with the problem, the appellants have urged us to redefine the aboriginal title concept to fit their particular situations. According to the claimants:

> 'Aboriginal title' as of 1795, if it means anything, must refer either to the customs and practices of the Indians in the ceded area, at the relevant times, or to the 1795 law of the sovereign United States. The sharing of lands by tribes who had not otherwise combined in the ceded area to form a new entity, conformed to both.

This attempt to have us redefine a concept which has stood the test of many decisions in the past is not persuasive. We are not disposed to discard a principle which has, in numerous cases, been held to meet the purposes and objectives of the Indian Claims Commission Act.

However, a denial of claimants' attempt at redefining the "aboriginal title" theory does not automatically result in the defeat of their aboriginal title claim. Although normally no tribe will be deemed to have proven aboriginal title when others used and occupied the land in question, there is a "built-in exception" to the "exclusivity" requirement. Actually, this "exception" merely creates a method of analysis of "exclusivity" in certain rare situations. In the past, the court has held on several occasions that two or more tribes or groups might inhabit an area in "joint and amicable" possession without erasing the "exclusive" nature of their use and occupancy. *See United States v. Pueblo of San Ildefonso, supra; Turtle Mt. Band of Chippewa Indians v. United States*, 490 F.2d 935, 203 Ct.Cl. 426 (1974); *Sac & Fox Tribe v. United States*, 383 F.2d 991, 179 Ct.Cl. 8, *cert. denied*, 389 U.S. 900, 88 S.Ct. 220, 19 L.Ed.2d 217 (1967). To qualify for treatment under "joint and amicable" occupancy, the relationship of the Indian groups must be extremely close. We described just such a relationship in *Sac & Fox Tribe v. United States*, 383 F.2d at 995, 179 Ct.Cl. at 16, as follows:

Originally the Sac and Fox Nation consisted of two separate and identifiable tribes of Indians belonging to the Algonquin stock. Around 1735, due to their mutual hostility and conflict with the French, they formed a close and intimate alliance, politically and socially, *so that from thence forward they have been dealt with and referred to as a single nation both in their relationship with other Indian tribes and in treaty negotiations and other matters with the United States.* (Emphasis supplied)

Indeed, the tribal relationship between the Sac and the Fox was deemed by the court to be so close as to constitute a "merger" of the previously existing tribal entities.

The Commission was correct in finding that no such relationship existed among the tribal claimants in the case presently before the court. The attempts by appellants to prove the existence of a "confederacy" of various tribal entities living at times in Royce Area 11 are simply not persuasive, when one reviews the evidence presented to the Commission. The cooperation upon which claimants rely can be explained readily without reference to any "confederacy" theory. In this regard it should be remembered that Royce Area 11 was, during the relevant time period, "an immense open territory which was sufficiently large to accommodate all those Indians who settled or hunted there." 31 Ind.Cl.Comm. at 111. Thus, one reason for cooperation among the tribal claimants was the lack of any need for inter-tribal warfare over the property rights of the various tribes. The area was simply too large and untamed for such activity to be necessary. Furthermore, the cooperation which did exist resulted from the existence of a common enemy, the "white man," who, according to the evidence, battled the tribes continuously. Finally, there is little evidence in the record to support a theory that the Indians considered themselves as "one nation." The 1750 inter-tribal council, relied on so heavily by the claimants, was not such a recognition; instead, it was an attempt to reduce the likelihood of armed conflict between various tribes interested in their own tribal interests. The United States did not view the tribal residents of Royce Area 11 as a confederacy. For example, the Commission, in looking at those lands on the Indian side of the Greeneville Treaty Line, found:

> * * * it was understood by the Government's representatives and the Indians [at Greeneville] that each tribe had separate lands, that there was no community of interest in the lands of the Northwest territory.

5 Ind.Cl.Comm. 180, 214 (1957). For these reasons, we reach the same conclusion that we reached in *Iowa Tribe v. United States*, 195 Ct.Cl. 365, 370 (1971), cert. denied, 404 U.S. 1017, 92 S.Ct. 677, 30 L.Ed.2d 664 (1972), where we held:

> The [tribes] did not consider themselves, and were not treated, as a single or closely integrated entity, but rather as separate political groups which were friends or allies (for the most part). Their use of the same lands may have been in common, like much of Indian use of the midwestern and western regions—but the Commission could properly decide that it was not proved to be truly joint, and therefore that each separate tribe's claim to Indian title would have to be tested on its own distinct basis.

Taking each tribe's right to title individually, and utilizing the applicable precedents discussed above, it becomes obvious that the Commission's denial of aboriginal title for a large portion of Royce Area 11 was correct.

■ *Recognized title.* Several of the claimants in this case also argue that, even if aboriginal title is not found for Royce Area 11, their ancestors had "recognized title" to this land. According to their contentions, Indian title to this land was recognized by the Government (1) by its assumption of the rights and obligations of the British Crown under the Fort Stanwix Treaty of 1768; (2) by its own treaties of 1775, 1776, and

1778, and (3) by its acknowledgments of Indian title during the post-Revolutionary War era. We recognize at the outset that "we are free to reach our own independent conclusion on this question since the interpretation of a treaty is a question of law and not a matter of fact." *Citizen Band of Potawatomi Indians v. United States*, 391 F.2d 614, 618, 179 Ct.Cl. 473, 482 (1967), *cert. denied*, 389 U.S. 1046, 88 S.Ct. 771, 19 L.Ed.2d 839 (1968); *see Minnesota Chippewa Tribe v. United States*, 315 F.2d 906, 908, 161 Ct.Cl. 258, 262 (1963). After making that independent determination, we have concluded that the Commission's denial of recognized title in this case was correct.[5]

■ The doctrine of recognized title, like that of aboriginal title, is not novel, and there can today be little room for misunderstanding precisely what proof must be presented by claimants seeking to benefit from it. These standards were clearly summarized in *Miami Tribe v. United States*, 175 F.Supp. 926, 936, 146 Ct.Cl. 421, 439 (1959) as follows:

> Where Congress has by treaty or statute conferred upon the Indians or acknowledged in the Indians the right to *permanently* occupy and use land, then the Indians have a right or title to that land which has been variously referred to in court decisions as "treaty title", "reservation title", "recognized title", and "acknowledged title." As noted by the Commission, there exists no one particular form for such Congressional recognition or acknowledgment of a tribe's right to occupy permanently land and that right may be established in a variety of ways. [citing *Tee-Hit-Ton v. United States*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955); *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949); *Minnesota v. Hitchcock*, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954 (1902).]

[11] The significance of the recognized title doctrine generally lies in the fact that a plaintiff successful on this issue need not present proof demonstrating aboriginal use and occupancy. *Miami Tribe, supra*, 175 F.Supp. at 940, 146 Ct.Cl. at 445. The theory has special interest to the claimants in this case, since it was their failure to prove "exclusive use" which resulted in their defeat on the aboriginal title claims discussed above.

■ Although the claimants need not demonstrate "exclusive use" to show possession of recognized title, they must still prove that Congress intended to recognize that they had the right to permanently use and occupy the land area under scrutiny. This requirement has long been a part of the recognized title doctrine as enunciated by the Commission and the courts. As we stated in *Sac & Fox Tribe v. United States*, 315 F.2d 896, 900, 161 Ct.Cl. 189, 197, *cert. denied*, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963):

> Appellants apparently assume that "recognition" or "acknowledgment" necessarily follow from an acceptance by the United States of the bare fact that the particular Indians dwelt or hunted, or claimed to dwell or hunt, in the area at that time. But there must be another indispensable element before recognition is had. *The Congress must affirmatively intend to grant the right to occupy and use the land permanently.* (Emphasis supplied.)

Taking a close look at each treaty, we have determined that the claimants have failed to show the necessary Congressional intention to grant them "permanent" rights in Royce Area 11. They have failed to demonstrate that the "recognition" involved here was anything more than "permissive occupation." *See Sioux Tribe v. United States*, 500 F.2d 458, 205 Ct.Cl. 148 (1974). The 1768 Fort Stanwix Treaty, upon which the Chippe-

---

**5.** Claims listed in the Opening Brief of Certain Appellants as "moral and equitable claims" are merely a repetition of plaintiffs' aboriginal title claims and are likewise without merit.

*See Otoe & Missouria Tribe of Indians v. United States*, 131 F.Supp. 265, 131 Ct.Cl. 593, *cert. denied*, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955).

564

wa, Shawnee and Wyandot rely, was negotiated by the British to protect against a threatened Indian uprising. Furthermore, this treaty was entered into by the Six Nations of New York. It is very questionable what role, if any, was played by the Ohio tribes at this conference, since their representation was quite small and their "rank and file" never accepted the boundary drawn up by the agreement. The meetings in Pittsburgh during 1775 and 1776 occurred because of the Government's desire to maintain a semblance of Indian neutrality during the Revolutionary War; these informal gatherings cannot be viewed as Government recognition of Indian title. The Treaty of September 17, 1778, relied on by the Delaware claimants, was clearly a treaty of peace entered into by the Government to counter British propaganda that the Americans planned to confiscate Indian lands. At most, the guarantee of Delaware "territorial rights" as described in Article VI of the 1778 treaty can be read as a declaration of American intention to continue the former British policy of respecting Indian title where it was established against third parties.

By the end of the American Revolution, the intent of the United States Government was "unequivocally the opposite of what is required to establish recognized title." 31 Ind.Cl.Comm. at 107. Through the post-Revolutionary War era until 1795, the Government attempted through its military might and its skills at the negotiating table to rid Royce Area 11 of the appellants. The first treaty negotiated after the close of the War was the Treaty of Fort Stanwix of October 22, 1784, in which the Government attempted to convince the tribal representatives of the Six Nations that Indian title had been relinquished by their ally, Great Britain, in the Treaty of Paris of 1783. This so-called "right of conquest" theory is evidence of the Government's intention not to acknowledge Indian title, but to make peace with formerly hostile Indians and at the same time to obtain clear rights to lands

northwest of the Ohio River. This doctrine was also used in various talks with the Wyandot, Delaware, Ottawa, Chippewa, and Shawnee during 1785–1786 but proved, in the end, to be unsuccessful in maintaining peace in Royce Area 11. Instead, augmented by British agents, the Indian hostility remained. Toward the end of 1787, in response to pleas for another treaty, a Congressional committee recommended to the Congress that the "policy of conquest" be replaced by a policy in which the Government would negotiate and "purchase" the Indian lands in question. Congress then authorized Governor St. Clair of the Northwest Territory to negotiate with the dissident tribes instructing him as follows:

> The primary objects of the treaty are, the removing [of] all causes of controversy, so that peace and harmony continue between the United States, and the Indian tribes, the regulating [of] trade, and settling boundaries * *

This change in policy does not demonstrate, as claimed by several of the appellants, that the Government had determined to recognize Indian title to this area. To the contrary, the Government's instructions to its representative demonstrate that its motives were otherwise. Furthermore, the Government's activities in encouraging settlement in this region pursuant to the Ordinance of May 20, 1785, does not show an intention to recognize Indian title. Thus, we have concluded, after reviewing the evidence presented to the Commission, that the treaties and policies cited by appellants do not show that any of them had "recognized title" to any part of Royce Area 11.

■ *The Government's Cross-Appeal as to Royce Area 11.* We also affirm the Commission's finding of aboriginal title for the Delaware and Shawnee Tribes in the two relatively small portions of Royce Area 11. In describing the area of land awarded to the Delaware Tribe, the Commission stated:

> Delaware presence in [the upper Muskingum and its tributaries] during

[1742 to 1781] was overwhelmingly predominant and lasted a long time. Those incidents of use and occupancy by other Indians we view as permissive or as so sporadic as not to be inconsistent with Delaware use and occupancy * * * Based upon the evidence in this record, we conclude that as of the date of the 1795 Treaty of Greeneville, the Delaware Indians possessed aboriginal title to that portion of Royce Area 11 included within the present-day counties of Tuscarawas, Coshockton and Muskingum in Ohio. 31 Ind.Cl.Comm. at 121. With regard to the Shawnee award tract, the Commission found that:

> The Shawnees continuously used and occupied this area from the late 1730's until they were forced to abandon these lands in the late 1770's * * * Until they were forced out in the late 1770's, the Shawnees had established Indian title to the area bounded on the north by an east-west line running along the 40th degree north latitude and on the south by a straight line running from the city of Athens in Athens County west to the town of Highland in northern Highland County, and bounded on the east and west by the lines described in note 6 of the findings of fact as the east and west boundaries of central Royce Area 11.

31 Ind.Cl.Comm. at 122–23. Defendant appeals from this portion of the Commission's opinion, claiming that (1) the Commission's findings of fact do not support its ultimate determinations that aboriginal title existed for these portions of Area 11; (2) the Delaware and the Shawnee had abandoned their respective lands prior to 1789, and (3) the "prior sovereigns" of Virginia, Connecticut and the "Colonial Confederacy" extinguished Indian title to this land.

The thrust of defendant's first argument is that the Commission failed to use the correct standard of proof for determining aboriginal title. We acknowledge that the findings are not as clear and concise as they might have been. However, after much study, we have decided that the findings themselves are supported by substantial evidence. It is clear that the Commission, after finding that the two tribes in question enjoyed "predominance" over certain portions of Royce Area 11, restricted the determination of aboriginal title to that limited area of land over which the tribes in question enjoyed exclusive occupancy and control. We are not presented here with a situation in which we are unable to ascertain precisely what method the Commission utilized to arrive at its final decision. *Cf. Seminole Indians v. United States*, 455 F.2d 539, 197 Ct.Cl. 350 (1972). Indeed, it would be unreasonable to conclude that the Commission would use a standard of proof other than the one with which it is so familiar, which it found so readily in the case law, and which it set forth so accurately in its opinion. Therefore, defendant's contentions concerning abandonment and extinguishment of title to these tracts of land are without merit and deserve no extended discussion in this opinion.

II

Having resolved the claims relating to Royce Area 11, we now turn to the remaining appeals. In the 1795 Greeneville Treaty, the Indians not only ceded Royce Area 11, but also relinquished their claims to 16 enclaves (described in Article III), five rights of passage (described in Article III), and four other areas (described in Article IV)—all of which were located north and west of the Greeneville Treaty Line. In the proceedings before the Commission, the Indian claimants sought to establish aboriginal title to these areas. In some instances they were successful; in others they were not. On appeal, we are primarily concerned with the areas in which the Commission found that the appellants had no aboriginal title. The Government's cross-appeal is limited to the Commission's determination in favor of the Wyandot.

The Commission found insufficient evidence of Indian title with respect to Royce Areas 12, 13, 14, and 15 in Ohio,

Detroit and the surrounding area, the areas located at the Straits of Mackinac (Royce Areas 21, 22, and 23 in Michigan), Royce Area 25 (known as Clark's Grant), Royce Area 26 (the Vincennes Tract), and the lands traversed by three of the rights of passage. Several Indian groups have appealed from the Commission's determination as to these areas. In addition, the Ottawa Tribe claims it is entitled to participate in the Wyandot recovery for an area around Fort Sandusky in Ohio. The Peoria Tribe of Oklahoma (representing the Weas) asserts that the Commission erred in denying recovery for the Ouatanon enclave and that the Peoria Tribe is entitled to participate in the recoveries of the Miami Tribe. For the reasons given below, we reject the claims of the appellants, as well as the Government's cross-appeal, and affirm the Commission's determination as to all areas with the exception of the Ouatanon enclave. The findings of the Commission as to this enclave are not sufficient to enable us to decide the issue raised in the appeal by the Peoria Tribe.

■ *The Vincennes Tract (Royce Area 26, Indiana).* The Vincennes Tract, ceded to the United States in the 1795 Greeneville Treaty, was defined in Article IV of the Treaty as follows: "[t]he post of St. Vincennes on the river Wabash, and the lands adjacent, of which Indian title has been extinguished." The question before us is whether the appellants possessed aboriginal title to any part of what is known as the Vincennes Tract (Royce Area 26) at the time of the Greeneville Treaty.

The Commission found that the boundaries of the Vincennes Tract ceded at Greeneville were described in the 1803 Fort Wayne Treaty (7 Stat. 74) and that in the 1803 Treaty, the Indians acknowledged that any claims they may have had to this area were extinguished prior to 1795. The Commission further found that no Indian tribes possessed aboriginal title to the Vincennes Tract at the time of the 1795 Greeneville Treaty.

The Peoria/Piankeshaw and the Delaware Tribes appeal from this determination. They contend that the two tribes between them had aboriginal title to the area around St. Vincennes until 1803 (except as to that portion of the land which had been given to the French prior to the Greeneville Treaty). They also claim that the Indians ceded only an area of 180,000 acres at Greeneville and that in the 1803 Fort Wayne Treaty, the United States defined the ceded area around St. Vincennes in such a way that the tract was increased from the original cession of 180,000 acres to an area of 1.8 million acres. From this, they argue that the 1803 Treaty provided no additional consideration to the Indians for the increase in the amount of the ceded land, and that the Indian parties to the treaties are entitled to recover under the Indian Claims Commission Act for an unconscionable taking of property amounting to the difference between the 1.8 million acres and the 180,000 acres originally ceded in 1795. We hold that the Commission's determination is supported by substantial evidence and is correct as a matter of law. Therefore, we reject appellant's arguments to the contrary.

The Greeneville Treaty did not specifically delineate the boundaries of the Vincennes Tract; rather the treaty makes only a vague reference to lands in which title had previously been extinguished. The record shows that the Indians had given the French an area of land surrounding St. Vincennes in about 1742, but the size of the grant was not clearly defined. *See,* L. Lux, *Vincennes Donation Lands* 428–29 (1949); Carter, *Territorial Papers of the United States,* Vol. II 58–59 (1934). Nor were the boundaries of the French grant subsequently clarified under the periods of British and American control prior to 1795. While the United States did institute a land grant system in 1788 under which it is estimated that the United States eventually distributed about 180,-000 acres in the Vincennes area (*see,* L. Lux, *supra,* at 444–46, 478, 481), there is

no indication that these grants bore any relationship to the total amount of land which the Indians had given the French and which were subsequently ceded to the United States at Greeneville. Thus, there was apparently no definite understanding at the time of the Greeneville Treaty concerning what lands had previously been alienated by the Indians.

It was only after the Greeneville Treaty that the Governor of the Indiana Territory, William Henry Harrison, undertook to define the boundaries of the Vincennes Tract. Because of the uncertainty, even at that time, as to the extent to which the Indians had alienated the land around Vincennes prior to Greeneville, Harrison began negotiations with the Indians in the Vincennes area with a view toward establishing the boundaries by agreement. These negotiations culminated in the 1803 Fort Wayne Treaty, by which the parties agreed to the cession of approximately 1.8 million acres.[6] The 1803 Treaty is the first time that the boundaries of these lands were clearly defined, and there is no indication that the 1803 Treaty increased the size of the Vincennes Tract, as appellants argue. The 1803 Treaty was intended to define the scope of the earlier cession, not to change it. Under these circumstances, we do not find the absence of additional considera-

tion a factor[7] which entitles appellants to recover.

In other cases, we have relied upon subsequent treaties to define the boundaries of lands covered by the Treaty of Greeneville (see *Miami Tribe v. United States*, 175 F.Supp. 926, 938, 146 Ct.Cl. 421, 442 (1959)). We follow the same practice in this instance where the question is one of defining the boundaries of the land ceded to the United States at Greeneville.

At Greeneville, the Indians ceded the lands surrounding St. Vincennes to which title had previously been extinguished. This area was defined in the 1803 Treaty as the entire area now included in Royce Area 26. Consequently, appellant's attempt to prove aboriginal title to this area or any part of it in 1795 by evidence of use and occupancy was not successful.

Even if it is conceded that the Delawares and the Piankeshaws had used a part of the Vincennes Tract prior to Greeneville, as appellants argue, such shared use, without more, would not constitute the exclusive use and occupancy required to establish aboriginal title.

■ *Clark's Grant (Royce Area 25, Indiana).* Clark's Grant is a tract of 150,000 acres of land located in southern Indiana which was ceded to the United

---

**6.** The First Article of the Fort Wayne Treaty of June 7, 1803, provided:

"Whereas it is declared by the fourth article of the treaty of Greeneville, that the United States reserve for their use the post of St. Vincennes and all the lands adjacent to which the Indian titles had been extinguished: *And whereas*, it has been found difficult to determine the precise limits of the said tract as held by the French and British governments: it is hereby agreed, that the boundaries of the said tract shall be as follow: Beginning at Point Coupee on the Wabash, and running thence by a line north seventy-eight degrees, west twelve miles, thence by a line parallel to the general course of the Wabash, until it shall be intersected by a line at right angles to the same, passing through the mouth of White river, thence by the last mentioned line across the Wabash and towards the Ohio, seventy-two miles, thence by a line north twelve degrees west, until it shall be intersected by a line at

right angles to the same, passing through Point Coupee, and by the last mentioned line to the place of beginning." 7 Stat. 75.

**7.** Before the Commission, the appellants claimed that they had aboriginal title in 1795 to part of Royce Area 26. In order to recover, they had to show not only that they used this area prior to 1795, but also that the entire area had not been alienated prior to 1795. In the proceedings before the Commission, the appellants had an opportunity to put in evidence on both points or to respond to the Government's evidence concerning the Indian alienation of the land in the Vincennes area prior to 1795. Under the circumstances, we do not think the Commission erred in relying upon the 1803 Treaty to establish the extent of pre-Greeneville alienation. Nor is it appropriate to remand the case to enable the appellants to put in evidence to show that the pre-Greeneville alienation was smaller than the estimated 180,000 acres distributed by the United States.

States for the use of George Rogers Clark and his men by Article IV of the Greeneville Treaty.[8] The appellants[9] claim that the Commission erred in finding they had no aboriginal title to this area. They argue (1) that, since this area contains only 150,000 acres, proof of specific village locations within the area should not be required to establish Indian ownership; (2) that appellants' showing of use and occupancy of the adjoining areas should be sufficient to cover this area, and (3) that the findings of the Commission on this issue are self conflicting.

While the Commission found that the appellants had title to several different pieces of land adjacent to Royce Area 25 (*see* 31 Ind.Cl.Comm. 89, 131), there is a lack of evidence showing exclusive use and occupancy of Royce Area 25 by any one tribe or a united group of tribes. Appellants have based their claim upon the shared use of this land by the neighboring tribes, and they ask for a recovery to be divided among the several tribes. As previously stated, the mere fact that two or more different tribes shared the use of the land is insufficient to establish joint Indian title to the property. Since the appellants have not made the requisite showing of exclusive

use and occupancy, we find that the Commission's determination is supported by substantial evidence.

There is no "logical contradiction" in the Commission's finding that the United States "perfected its title" to Clark's Grant in the Greeneville Treaty and its finding that none of the appellants had title to this tract. At Greeneville, the Indians jointly acknowledged the earlier grant to Clark and the United States confirmed its title to this land.[10] Appellants failed to show either an aboriginal or a recognized title interest in this land. The fact that they collectively granted it to Clark and subsequently acknowledged the grant in the Greeneville Treaty, does not give them a compensable interest in the land.

■ *Royce Areas 12, 13, 14, 15, and the Rights of Passage.* Royce Areas, 12, 13, 14, and 15 are separate tracts (or enclaves), located north and west of the Greeneville Treaty line, which were ceded to the United States at Greeneville.[11] As to these areas, the Commission found that none of the Indian claimants had aboriginal title in 1795. The Commission also found that Royce Areas 12, 13, and 14 were located so close to the Greeneville Treaty Line that they should be treated as appendages of the nearby por-

---

**8.** Subsection 1, Article IV, of the 1795 Greeneville Treaty provided:

"The tract of one hundred and fifty thousand acres near the rapids of the river Ohio, which has been assigned to General Clark, for the use of himself and his warriors [shall be excepted from the general relinquishment of claims by the United States to land north and west of the Greeneville Treaty Line]". 7 Stat. 51.

**9.** The appellants on this claim are the Peoria (Piankeshaw/Wea) plaintiffs in Docket 338, the Delaware plaintiffs in Dockets 27–B and 338, and the Miami plaintiffs in Docket 252.

**10.** The original grant to Clark was made long before the Greeneville Treaty. On June 16, 1779, after Clark captured Vincennes from the British, Clark received a "deed of gift" to what is now known as Clark's Grant. The "deed of gift" was signed by the Piankeshaw chief, Francis son of Tobacco, who made the gift in the names of "all the Great Chiefs and Warriors of Ouabash and their allies." At that time,

Clark was a Colonel in the Virginia militia, and he accepted the lands as a possible site for a fort.

In 1784, Virginia ceded its claims to this tract along with its claims to other tracts northwest of the Ohio River to the States of the Confederation. The United States held this title until the Indians ceded their rights to Clark's Grant in 1795.

**11.** Royce Areas 12 through 15 are described in Article III of the Greeneville Treaty as follows: *Royce Area 12*: "One piece of land six miles square at or near Loromie's store;" *Royce Area 13*: "One piece two miles square at the head of the navigable water or landing on the St. Mary's river, near Girty's town;" *Royce Area 14*: "One piece six miles square at the head of the navigable water of the Au-Glaize river;" *Royce Area 15*: "One piece six miles square at the confluence of the Au-Glaize and Miami rivers, where Fort Defiance now stands." 7 Stat. 50.

tions of Royce Area 11. Moreover, the Commission found that the sporadic use of Royce Area 15 by various groups did not support a finding of aboriginal title in any tribe.

 Several Indian tribes are appealing from this decision.[12] These appellants all argue, at least in part, that these areas should be treated the same as Royce Area 11 and that the various Indian tribes shared the use of the land, thus acquiring a common compensable interest or a "joint aboriginal title." We rejected this argument in our discussion of the Vincennes Tract, Clark's Grant, and Royce Area 11, and we need not discuss it further. The fact that Royce Area 14 is adjacent to Royce Areas 165 and 166, which were granted to the Shawnee by Article 6 of the Treaty of September 29, 1817 (7 Stat. 162), and that Royce Area 14 was relatively close to Shawnee settlements in Royce Area 11 in the late 1770's and early 1780's, does not establish exclusive use and occupancy by the Shawnee of Royce Area 14. Since there is little or no evidence of exclusive use and occupancy by any tribe or unified combination thereof in any of these areas, we hold that the Commission's determination is supported by substantial evidence.

Article III of the Greeneville Treaty also granted the United States free passage over certain routes on the Indian side of the Greeneville Treaty Line. These rights of passage were not cessions, but they nevertheless constituted a grant of valuable property rights. Only three of the rights of passage are in issue on appeal—those designated by the Commission as routes 1, 2, and 3. As to these, the Commission found that appellants had no aboriginal title interest.[13] Here again, the appellants[14] argue that they have a compensable interest by virtue of their shared usage of the land traversed by the rights of passage. We cannot accept this position for the reasons previously stated in the discussion of the claims to Royce Area 11. Accordingly, the decision of the Commission on this issue is affirmed.

*Royce Areas 21, 22, and 23.* These areas consist of land on Mackinac Island and the northern tip of lower Michigan at the Straits (Royce Area 21), the southern tip of the upper Michigan peninsula (Royce Area 22), and the Island of Bois Blank located a few miles from the Straits (Royce Area 23). The appellants[15] contend that the Commission erred in finding that they had no aboriginal title to these areas; again, they argue that their shared use of the land made them joint owners of the land. This contention is rejected on the same grounds which we have discussed in denying similar claims.

**12.** The Miami Tribe in Docket 252 has filed an appeal with respect to Areas 12 and 13; the Shawnee in Dockets 335 and 338 has appealed with respect to Royce Areas 12, 13, and 14; the Ottawa plaintiffs in Docket 338 appeal the determination in Areas 13, 14, and 15; the Wyandot in Docket 120 and the Shawnee in Docket 64 join in appealing the determination as to Areas 12, 13, 14, and 15; and the Chippewa plaintiffs in Docket 13–G appeal the determination with respect to Area 15.

**13.** The rights of passage described in the last paragraph of Article III of the Greeneville Treaty are nearly all over the waters of navigable rivers. The portions that traverse land are (1) that portion of the first passage running from Loromie's store (Royce Area 12, Ohio) to the St. Mary's River (the portage path meets the St. Mary's River within Royce Area 13, Ohio); (2) that portion of the second passage running from Loromie's store (Royce Area 12, Ohio) to the Au-Glaize River at a point within Royce Area 14—this passage includes the portage between Royce Areas 12 and 13 and then proceeds through Royce Area 87 for a distance of approximately nine miles to Royce Area 14; and (3) that portion of the third described passage running from Loromie's store (Royce Area 12) to the Sandusky River (this passage most probably proceeded across south-central Royce Area 87 for a distance of approximately 60 miles). *See* 31 Ind. Cl.Comm. 89, 202–03.

**14.** The Wyandot plaintiffs in Docket 120, the Shawnee in Docket 64, the Chippewa in Docket 13–G, and the Shawnee and Peoria in Dockets 335 and 338, and the Ottawa plaintiffs in Docket 338 all appeal the Commission's determination with respect to the rights of passage.

**15.** The appellants in this instance are the plaintiffs in Dockets 18–M and 40–F (Ottawa and Chippewa), as well as the Potawatomi Tribe, plaintiffs in Docket 15–E.

The Ottawa and Chippewa appellants make the further argument that they should be treated as joint owners of these lands in the same way as was done with Royce Area 205, which is adjacent to the lands in issue here (*see* 7 Ind.Cl. Comm. 576). The Ottawa and Chippewa parties in this appeal were the plaintiffs in that case, where the Commission found that the Ottawa and Chippewa Tribe had aboriginal title to Royce Area 205, primarily because they found that the Ottawa and Chippewa had formed a single entity sometime after 1795 and before 1836. The appellants here have not shown evidence of such unity prior to 1795. The fact that these tribes combined into a single entity after 1795 does not show that they jointly owned the land prior to that date. The Commission found that in 1795 Royce Areas 21, 22, and 23 were areas of common use and occupancy by autonomous bands of the Ottawa and Chippewa Indians and that they failed to establish aboriginal title. We find this determination is supported by substantial evidence.

*Detroit and Surrounding Area.* This area consists of approximately 288,000 acres around Detroit. In this appeal, the Wyandot Tribe argues that the Commission erred in finding that no tribe possessed aboriginal title to the area surrounding Detroit in 1795. The Ottawa Tribe and the Prairie Band of the Potawatomi Indians also appeal from the Commission's decision on the ground that they shared the use of this area with other tribes and thus acquired a joint interest in the land, for which they are entitled to compensation.

The main issue is whether the Wyandot Tribe established aboriginal title to the land. The evidence shows that Cadillac founded a post at Detroit in 1701. From 1710 to 1720, four tribes had settlements around Detroit: Chippewa, Potawatomi, Ottawa, and Wyandot (Huron). While the Chippewa never established a strong presence in the area, the other tribes shared the use of these lands for about half of the Eighteenth Century. The Ottawas occupied a village near Detroit until 1763, when they moved south into the Maumee River area of Ohio; the Potawatomis occupied a village in the ceded area from 1710 to approximately 1764 when they left the area; and the Wyandots maintained a settlement in the area from 1705 to 1742 when they moved across the Detroit River into present-day Ontario. The period of mixed occupancy up to approximately 1763 shows that no tribe or unified tribal combination had the requisite exclusive use and occupancy to establish aboriginal title up to that time.

The Wyandot claim is based primarily on the fact that in 1777 they established two village sites at present Wyandotte and Gibraltar, Michigan, within the ceded area, and that they remained there until 1796. The Commission found that no other Indian groups were in the area during these years. The Wyandot conclude that this is sufficient proof of exclusive use and occupancy to establish Indian title in 1795. The Wyandot position does not account for the fact that whites had moved into the Detroit area in relatively large numbers prior to the Greeneville Treaty. The Commission found that shortly after Cadillac's settlement of Detroit, whites were granted lands adjacent the Fort.

Later, several tracts of land were sold or granted by Indians to settlers. By 1788, there were approximately 4,000 whites settled on both sides of the Detroit River. The area for several miles around the post of Detroit was farmland. The Commission found that by 1795 most of the Detroit area was occupied by whites.

In this instance, we are not presented with a question of whether the white intrusion on Indian land extinguished a previously established aboriginal title. *Turtle Mountain Band v. United States,* 490 F.2d 935, 947, 203 Ct.Cl. 426, 447–48 (1974). Nor is the white settlement on the land being used to establish a date for the extinguishment of Indian title. *United States v. Pueblo of San Ildefonso, supra,* 513 F.2d at 1391; *United States v. Northern Paiute Nation,* 490

F.2d 954, 958, 203 Ct.Cl. 468, 474–75 (1974). Here, the Wyandot Tribe did not have aboriginal title at the time of white settlement, which began in the early Eighteenth Century and increased thereafter. The presence of white settlers in the area shows that the Wyandot Tribe did not exclusively use and occupy the entire Detroit area prior to 1795. On the basis of the evidence in the record, we conclude that the Commission's determination of this factual issue is supported by substantial evidence.

It is not necessary to discuss the claims of the Ottawa and the Prairie Band of the Potawatomi which are also based on the shared use theory. This argument has been treated in our discussion of Royce Area 11, and, again, we rely on the reasons given there in rejecting this claim.

■ *Ouatanon or the Old Wea Towns.* This area, ceded in Article III of the Greeneville Treaty, was described as "[o]ne piece six miles square at the Ouatanon or old Weea towns on the Wabash river." While the Commission found that this area was located within the aboriginal area of the Wea Nation in 1795, which at that time was a part of the Miami Tribe, the Commission also found that the area was subsequently returned to the Indians by the Treaty of September 30, 1809 (7 Stat. 113); that it was receded to the United States as part of Royce Areas 98 and 99 by the Wea and Miami Tribes in the Treaties of October 2, 1818 (7 Stat. 186) and October 6, 1818 (7 Stat. 189); that the Wea had been compensated for most of the land as part of Royce Area 99, and that a small portion of the ceded land north of the Wabash River is included within the claim of the Peoria Tribe in another docket (Docket 314–A) before the Commission. Consequently, the Commission determined that the Indians were not entitled to recover for this enclave.

Appellant [16] takes issue with this conclusion for several reasons, one of which

is that the evidence before the Commission is insufficient to show that the Weas were compensated for this land, even in part, through the recovery for Royce Area 99. After reviewing the briefs, treaties, cited cases, and after oral argument, we find that the Commission's determination on this issue is too summary for us to decide whether the Commission's findings are supported by substantial evidence or whether the conclusions of law are valid and supported by the findings of fact.

Article 8 of the Treaty of September 30, 1809, provided that "[t]he United States agree to relinquish their right to the reservation, at the old Ouroctenon towns, made by the treaty of Greenville, so far at least as to make no further use of it than for the establishment of a military post." (7 Stat. 114). It is significant that the Weas were not a party to this treaty, although they subsequently gave their consent (7 Stat. 116). Also, it is unclear which tribes received the rights to this area and what rights were received. Furthermore, the record does not show whether the Ouatanon enclave was included in the 1818 cessions by the Weas or the Miamis. We therefore conclude that the Commission has not furnished a sufficient statement of the reasons for its findings and conclusions under 25 U.S.C. § 70r(3) for us to review the Commission's decision on this issue. (*See Sac & Fox Tribe v. United States,* 196 Ct.Cl. 548 (1971); *United States v. Nez Perce Tribe,* 194 Ct.Cl. 490, 503, *cert. denied,* 404 U.S. 872, 92 S.Ct. 74, 30 L.Ed.2d 116 (1971) ), and we remand this portion of the case for further proceedings.

■ *The Area Around Fort Sandusky and Royce Area 20.* Article III of the Greeneville Treaty ceded to the United States the following area around Fort Sandusky: "[o]ne piece six miles square upon Sandusky lake, where a fort formerly stood." The Treaty describes Royce Area 20 as "[o]ne piece two miles

16. The appellant in this instance is the Peoria Tribe of Indians of Oklahoma in Docket 338, representing the Wea.

square at the lower rapids of the Sandusky river." These areas are located in northern Ohio on or near Lake Erie.. The Commission found that the Wyandot had Indian title to these areas because of their use of the Fort Sandusky area from 1737 to 1748 and from the early 1750's until after 1795 and on the basis that the Wyandots had exclusive use and occupancy of the land in Royce Area 20 from 1760 to 1794. The Commission further found that two bands of Ottawas settled in the Fort Sandusky area from 1784 to 1811 but that the use and occupancy by the Ottawas was with the permission of the Wyandots.

The Ottawa appellants take issue with the decision to the extent that it does not allow them to participate in the recovery for the Fort Sandusky area. They argue that the Commission found the Ottawas had two settlements in this area prior to 1795, that there is no evidence upon which to conclude that this use was by permission of the Wyandot, and that even if their use was by permission of the Wyandot, they have a compensable interest by virtue of their shared use of the property. We hold that there is substantial evidence to support the Commission's decision on this point. The Wyandot had been in the area around Sandusky for more than 30 years prior to the Ottawa settlements. There is evidence that the Wyandot had given permission to other Indian tribes to use their lands in Ohio, and we think the record, taken as a whole, supports the inference that the Ottawa were in the Sandusky area with the consent of the Wyandot. Permissive use by the Ottawa did not diminish the title of the Wyandot, and by the same token, such use gave the Ottawa no interest in the land. *The Spokane Tribe of Indians v. United States,* 163 Ct.Cl. 58, 68 (1963).

The Government also appeals from the Commission decision concerning the area around Fort Sandusky and from the determination as to Royce Area 20, claiming that Indian title to these enclaves had been extinguished by prior sovereigns before March 3, 1789, with the re-

sult that the Wyandot did not have aboriginal title at the time of the Greeneville Treaty. The Government takes the position that Virginia, Connecticut, or the Colonial Confederacy extinguished Indian title to these enclaves as well as to certain areas within Royce Area 11. The Commission found that the inclusion of the Fort Sandusky area within Connecticut's Western Reserve had no effect on the aboriginal title of the Wyandot to this area, which was ceded to the United States in 1795. We have considered the Government's arguments on prior extinguishment and conclude, as did the Commission, that the Wyandot held aboriginal title to these enclaves at the time of the Greeneville Treaty.

■ *Wea Participation in Miami Recoveries.* The Wea are currently one of the constituent tribes of the Peoria appellants in Docket 338. Before the Commission, the Wea claimed that they were entitled to a one-third interest in any Miami recoveries resulting from the Greeneville Treaty by virtue of the fact that the Miami, Eel River, and Wea had formerly been one nation and were a nation at the time of the 1795 Greeneville Treaty. The Commission did not go so far as to find what interest, if any, the Weas would have in any Miami recoveries, but the Commission did find that the Weas were part of the Miami Tribe in 1795.

The Miami appellant takes issue with the Commission's finding to the extent that it would allow the Weas to share in Miami recoveries. With the exception of Royce Areas 16 and 17, and a portion of the fifth described passage in Article III of the Greeneville Treaty, we have found that the Miami did not have a compensable interest in any of the lands ceded to the United States at Greeneville. Consequently, the question of Wea participation in Miami recoveries only concerns the recovery, if any, for two of the enclaves and one right of passage in which the Commission found the Miami held aboriginal title in 1795.

The appellant claims that the Weas had no interest in the disputed property

because the Weas did not occupy or control any of these lands or have a recognized title interest. Appellant argues further that the statement in the Grouseland Treaty that the Miami, Eel River, and Wea were "one nation" prior to 1805 did not constitute a retroactive determination that each tribe owned an undivided interest in the property of the other 10 years before the Grouseland Treaty. Finally, appellant argues that such intertribal relations were political rather than land-owning.

The evidence shows that the Miami, Eel River and Wea considered themselves as an entity and that they agreed to hold their property in common. Article IV of the Grouseland Treaty, signed August 21, 1805, provided:

> As the tribes which are now called the Miamis, Eel River, and Weas, were formerly and still consider themselves as one nation, and as they have determined that neither of these tribes shall dispose of any part of the country which they hold in common; in order to quiet their minds on that head, the United States do hereby engage to consider them as joint owners of all the country on the Wabash and its waters, above the Vincennes tract, and which has not been ceded to the United States, by this or any former treaty; * * * " (7 Stat. 91–92)

The Grouseland Treaty is an acknowledgment by the parties to the treaty that the Miami, Eel River, and Wea had formerly been an entity prior to 1805 and that they held their property in common. This was the basis for considering them to be joint owners of the property in 1805. In a letter to the Secretary of War, dated March 22, 1814, William Henry Harrison stated:

> The Miamies have their principal settlements at the forks of the Wabash, thirty miles from fort Wayne; and at Mississineway, thirty miles lower down. A band of them under the name of weas [sic], have resided on the Wabash sixty miles above Vincennes; and another under the Turtle on Eel river, a branch of the Wabash, twenty miles northwest of fort Wayne. By an artifice of the Little Turtle these three bands were passed on general Wayne as distinct tribes, and an annuity was granted to each. The Eel river and Weas however to this day call themselves Miamies, and are recognized as such by the Mississineway band.

The Commission has on two previous occasions found the Weas to have been a constituent part of the Miami Nation in the period prior to 1795 (see 2 Ind.Cl. Comm. 617, 618; 5 Ind.Cl.Comm. 180, 181) and these decisions were affirmed in pertinent part in 146 Ct.Cl. 421 (1959). This evidence supports the Commission's determination that the Wea were part of the Miami Tribe in the Eighteenth Century and as such they are entitled to participate in the Miami recoveries.

As for the division of interests, the Commission did not specify the percentage of recovery which should be given to the Wea, and neither party asks us to make such a determination. Accordingly, the allocation of interests is to be decided by the Commission on remand.

### III

In conclusion, we hold, with one exception, that the Commission has correctly resolved the numerous issues involving Royce Area 11 and the smaller areas north and west of the Greeneville Treaty Line. Accordingly, we affirm the Commission's determinations in these matters. As previously stated, that portion of the Commission's decision dealing with the Ouatanon enclave is remanded to the Commission for additional proceedings in accordance with this opinion. Since the amount to be recovered by the several appellants was not involved in the Commission's interlocutory decision, we also remand the case for further proceedings in that regard.

Remanded.