**UINTAH UTE INDIANS OF UTAH, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 92–427L.

United States Court of Federal Claims.

Aug. 6, 1993.

Kent A. Higgins, Idaho Falls, ID, for plaintiff.

Glen R. Goodsell, Washington, DC, with whom was Acting Asst. Atty. Gen., Myles E. Flint, for defendant. William Robert McConkie, Office of Sol., Dept. of Interior, of counsel.

### *OPINION*

NETTESHEIM, Judge.

This case is before the court after argument on defendant's motion to dismiss or, in the alternative, for summary judgment. Four overriding issues are presented: first, whether plaintiff, an Indian tribe, was party to an 1849 treaty upon which it now sues; second, whether, in any event, plaintiff has aboriginal title to the land at issue;

third, whether plaintiff pleads a breach of trust; and fourth, whether plaintiff is collaterally estopped from litigating these issues by reason of prior litigation before the Indian Claims Commission.

### FACTS

Except as noted, the facts are uncontroverted. The Uintah Ute Indians of Utah [1] ("plaintiff") are a Native American tribe currently residing, for the most part, on the Uintah and Ouray Reservation in Utah. The Uintah Band is a federally-recognized tribe organized under the Indian Reorganization Act of June 18, 1934, ch. 576, 48 Stat. 984, codified at 25 U.S.C. §§ 461–479 (1988). The White River (formerly Yampa/Grand River) and Uncompahgre (formerly Tabeguache) Ute bands also reside on the reservation.

### I. FORT DOUGLAS

In July 1862 the Government erected a military outpost, Camp Douglas, in the Utah Territory. On October 26, 1862, the Government renamed the camp Fort Douglas. On September 3, 1867, President Andrew Johnson reserved the land as a military post. The Fort was subsequently enlarged in 1887 and 1890. Fort Douglas is located on the east side of the Salt Lake Valley at the mouth of the Red Butte Canyon in the Wasatch Mountains. The Fort lies two miles east of Salt Lake City. This land is the focal point of the case at bar. Plaintiff alleges that its ancestors "were the original inhabitants upon the land ... now known as Fort Douglas, and exclusively used and occupied that land in accordance with their lifestyle, habits, customs, and usage." Plf's Compl. filed June 25, 1992, ¶ 5. Plaintiff further alleges that in 1852 "the territorial governor of the State of Utah [2] and [an] Indian agent" acknowledged unspecified "Indian" title to the land encompassed in Fort Douglas. *Id.* ¶ 6. Plaintiff contends that the Weber Utes, with whom the tribe asserts continuity of

---

1. The parties dispute the exact identity and location of plaintiff's band. Indeed, the multiple bands of Ute Indians confuse the analysis. Plaintiff tribe calls itself the Uintah Utes and the Ute Band.

2. Utah was not a state in 1852.

identity, continued to live in and around Salt Lake City until 1872, when they left subsequent to the signing of the Spanish Fork Treaty.

Beginning in 1895 Congress began to deed away portions of the Fort Douglas Reservation to the University of Utah. On November 5, 1990, the United States abandoned its use of 48 acres of Fort Douglas. On November 19, 1991, the Government quitclaimed the property to the University. Plaintiff argues that, without remuneration to the Uintah Band of Utes, this conveyance violated the Government's trust responsibilities to the tribe. Plaintiff claims "economic" damages for breach of trust in excess of $10,000.00 and asks for attorneys' fees and costs, as well.

## II. GENERAL HISTORICAL BACKGROUND

### 1. Aboriginal settlement of the Salt Lake Valley

Indians inhabited the area in and around what is now Fort Douglas as early as 1805 when Lewis & Clark encountered an Indian who spoke of the inhabitants in and around the Great Salt Lake.[3] Other explorers recorded contacts with Indians in the Salt Lake Valley in 1825, 1842, and 1844. In 1847 Mormon settlers arrived in Utah. Many early Mormon settlers noted encounters with Indians in and around Red Butte Canyon, near and on Fort Douglas' present site. These early settlers called the Indians "Utes" or "Shoshone." Plaintiff alleges that Indians later known as Uintahs inhabited the Salt Lake area under various names, such as Weber Utes (also known as Cumumbah) or Gosiute. Eventually these sub-tribal groups were all classified as the Uintah Band. In 1850 Congress created the Utah Territory which included part of what became the Colorado Territory.

### 2. The Mormons, the Federal Government, and the Uintah Utes

During the initial white settlement of the area, tension existed between Mormon leaders and the Government over Indian policy. The Government distrusted the Mormons' relationship with the Indians and vice-versa. Each side believed the other incited the Indians. Consequently, the Uintah Band endured a haphazard and often injurious Indian policy during the 1849–1865 period. (For example, the Utah Indian Agency received less federal funding than other agencies.)

Plaintiff alleges that the Mormon territorial government recognized Indian ownership of the lands within the Utah Territory. In particular, plaintiff points to acts passed in 1852 and 1855 that acknowledge Indian title to land in the territory. However, these acts do not specify a particular band of. Indians, nor do they designate specific boundaries of aboriginal land. As a result of anti-Mormon sentiment in the East, the Government formulated an express policy against extinguishing Indian title in the Utah Territory. In this manner the Government placed the title of Mormon settlers in doubt.[4] Plaintiff contends that the Government or its agents provided insufficient appropriations for land acquisition and gave specific orders not to extinguish Indian title to the Utah Indian Agency. In *Northwestern Bands of Shoshone Indians v. United States*, 95 Ct.Cl. 642 (1942), the Court of Claims documented the extinguishment issue with respect to a treaty between the Shoshone Indian Tribe and the Government. The court quoted a letter from the Commissioner of Indian Affairs to a committee formed to negotiate treaties with the Shoshone Indians:

"It is not expected that the treaty will be negotiated with a view to the extin-

---

3. Defendant also initially disputed the very existence of any Indians within the subject area. In its reply brief, defendant apparently concedes that some non-Uintah Utes inhabited the Salt Lake Valley.

4. Although plaintiff takes the position that Congress excluded the Utah Territory from the

Homestead Act of May 20, 1862, ch. 75, 12 Stat. 392 (1862), and Mormon settlers received no federally recognized legal title to lands that they occupied, the Act does not so provide. It appears that the Government did not designate a land district in Utah until 1868. Claim filing began in 1869.

guishment of the Indian title to the land, but it is believed that ... you will be enabled to procure from them such articles of agreement as will render the routes indicated secure for travel and free from molestation; also a definite acknowledgement as well of the boundaries of the entire country which they claim, as of the limits within which they will confine themselves...."

*Id.* at 651 (quoting a Letter from the Commissioner of Indian Affairs to Superintendent James Doty, Luther Mann, and former Superintendent Henry Martin dated July 22, 1862). Plaintiff contends that this letter reveals the Government's intention not to extinguish Indian title in negotiating treaties with all Utah Indians, at least in the Salt Lake Valley.

### 3. *Treaties with the Utah Indians*[5]

On December 30, 1849, plaintiff's alleged ancestors and the Government entered into a peace treaty at Abiquin, in what later became the State of New Mexico ("the 1849 treaty").[6] Because this treaty forms the basis for the court's jurisdiction, a close examination of all its provisions is warranted. In the treaty the Utah Indians submitted to the jurisdiction, power, and authority of the United States. The parties agreed to cease hostilities and to exchange prisoners and any stolen property. The treaty did not place property as such under the Government's guardianship, but it alluded to a relationship of protection and guardianship between the parties. The treaty further provided:

The contracting parties agree that the laws now in force, and such others as may be passed, regulating the trade and intercourse, and for the preservation of peace with the various tribes of Indians under the protection and guardianship of the Government of the United States, shall be as binding and obligatory upon the said Utahs as if said laws had been enacted for their sole benefit and protection. And that said laws may be duly executed, and for all other useful purposes, the territory now occupied by the Utahs is hereby annexed to New Mexico as now organized or as it may be organized or until the Government of the United States shall otherwise order.

Treaty with the Utah, Dec. 30, 1849, art. IV, 9 Stat. 984. The parties agreed to allow free passage to American citizens and others through the Indians' lands. The treaty stipulated:

In order to preserve tranquility, and to afford protection to all the people and interests of the contracting parties, the Government of the United States will establish such military posts and agencies, and authorize such trading-houses, at such time and in such places as the said Government may designate.

Treaty with the Utah, Dec. 30, 1849, art. VI, 9 Stat. 985. The Utahs agreed

that the aforesaid Government shall, at its earliest convenience, designate, settle, and adjust their territorial boundaries ... and so soon as their boundaries are distinctly defined, the said Utahs are further bound to confine themselves to said limits....

Treaty with the Utah, Dec. 30, 1849, art. VII, 9 Stat. 985. As consideration for the Utahs' agreement, the Government granted "donations, presents, and implements" and promised to "adopt such other liberal and humane measures," as it deemed appropriate. Treaty with the Utah, Dec. 30, 1849, art. VIII, 9 Stat. 985. On September 9, 1850, the Senate ratified the treaty. Plaintiff alleges continuity of identity with

---

5. "Utah Indians" refers to any and all Indians resident in Utah during this time period. The court also uses this term when no specific tribal name is ascribed to a group of Indians.

6. Defendant challenges whether plaintiff tribe descends from the same Utes who signed the 1849 treaty. In particular, defendant contends that the 1849 treaty involved the Colorado and New Mexico Utes. According to defendant, the Uintah Utes have no historical connection with these Colorado and New Mexico Ute bands. Therefore, defendant maintains, plaintiff cannot rely on the 1849 treaty for jurisdiction. The treaty document itself refers only to the "Utahs" as signatories. It does not mention band names such as Uintah or even Ute. The treaty by its terms does not specify which band of Utes agreed to its terms.

the Indian signatories to this treaty. At this point in history, plaintiff alleges, the Government made no distinction between the Utes in Utah or the Utes in Colorado and New Mexico. Consequently, plaintiff urges that this treaty applies equally to all Utes.

In 1861 President Abraham Lincoln issued an executive order creating the Uintah Reservation. Exec. Order of Oct. 3, 1861 (1 Kappler 900). Congress did not immediately ratify the order.[7] Plaintiff alleges that the Government desired a buffer zone between the Mormons in Utah and the eastern half of the United States. Moreover, the Government worried that Indian proximity to the overland routes to the West Coast imperiled the safety of settlers, miners, and the mails. The Army constructed Fort Douglas to protect these overland routes. Despite the executive order, however, the Government made no immediate effort to relocate the Uintahs.

In 1863 the Government entered into two agreements with the Utahs. The first, an oral agreement finalized on July 7, 1863, was concluded with Chief Little Soldier and the Weber (or Cumumbah) Indians near Salt Lake City. According to a written summary of this oral peace agreement, the Weber Utes agreed to cease depredations against the white man. They further agreed to remain encamped near the Great Salt Lake until allowed to venture to their hunting grounds. At a later meeting, James Doty, the Superintendent of Indian Affairs met with other unspecified Ute bands. These bands also agreed to make peace in return for presents and provisions.

On October 12, 1863, Superintendent Doty entered into the Treaty of Tuilla Valley (also known as the Shoshonee–Goship Treaty). Shoshonee–Goship Treaty, Oct. 12, 1863, 13 Stat. 681. Plaintiff alleges that the Cumumbah were among the Indians who signed this treaty of amity and peace. Because plaintiff contends that the Cumumbah constituted part of the Uintah Band, plaintiff views itself as a party to

this treaty. However, the treaty document only specifies the Shoshonee–Goship Band of Indians. This treaty specified the following area as Shoshonee territory: "On the north by the middle of the Great Desert; on the west by Steptoe Valley; on the south by Tooedoe or Green Mountains; and on the east by Great Salt Lake, Tuilla, and Rush Valleys." Shoshonee–Goship Treaty, Oct. 12, 1863, art. V, 13 Stat. 682. Plaintiff alleges that these boundaries encompass the area now occupied by Fort Douglas. The Shoshonee–Goship agreed to keep travel routes unobstructed. They also consented to the construction of military posts along the westward emigrant routes. The Senate ratified the treaty in 1864.

According to plaintiff, the peace treaties entered into with plaintiff tribe did not provide for extinguishment of aboriginal title to land. The issue of who owned land in the Utah Territory therefore remained unsettled. The discovery of valuable minerals in the mountains and the resultant influx of miners further encroached upon the Indians already driven from the lowlands. Settlers in the area began to complain that the Utes had not moved with dispatch to their reservation. In 1864 the Governor of Utah, Amos Reed, asked the Government to negotiate treaties to extinguish Indian title to the land. In February 1865 Congress passed a law authorizing the President to enter into treaties with Indians in the Utah Territory that would extinguish Indian title. An Act, To Extinguish the Indian Title to Lands in the Territory of Utah Suitable for Agricultural and Mineral Purposes, ch. 45, 13 Stat. 432 (1865). The Act also provided for the establishment of reservations as far as practicable from areas of white settlement. Plaintiff takes the position that this was the first congressional act to extinguish Indian title in the Salt Lake Valley. Plaintiff also urges that the Act mandated that extinguishment could only be accomplished by treaty.

---

7. It is unclear whether ratification of such an order was required. However, in 1864 Congress ratified the order, thus consenting to the creation of the Uintah Reservation. Act of May 5, 1864, ch. 77, 13 Stat. 63 (1864).

In June 1865, pursuant to the congressional legislation, ex-Governor Brigham Young and the Utah Superintendent, O.H. Irish, negotiated a treaty with the Utes. On June 8, 1865, they signed the Treaty with the Utes, Yampah Ute, Pah-vant, Sanpete Ute, Tim-p-nogs, and Cumumbah Bands of the Utah Indians (also known as the Spanish Fork Treaty). In the Spanish Fork Treaty, the signatory Indians agreed to cede their claims to land title in Utah and to move to the Uintah Reservation in exchange for an annual subsistence payments. On October 30, 1865, the Weber (Cumumbah) Utes signed a treaty incorporating the terms of the Spanish Fork Treaty. From 1865–1866 most of the Utes were removed to the reservation. In March 1866 President Johnson submitted the treaty to Congress for ratification. Three years later, on March 11, 1869, Congress rejected the Spanish Fork Treaty.

## III. THE INDIAN CLAIMS COMMISSION'S FINDINGS

The Uintah Ute Band previously brought suit against the United States for a taking of aboriginal land. In *Uintah Ute Indians v. United States*, 5 Ind.Cl.Comm. 1 (1957), the Uintah Band sued for compensation under the fifth amendment to the U.S. Constitution and the Indian Claims Commission Act, ch. 959, 60 Stat. 1049 (1946), codified at 25 U.S.C. §§ 70–70n, 70o–70v–3 (1976) (omitted 1978), § 70w (repealed 1949). The Indian Claims Commission ("the Commission") made extensive findings and issued an opinion in plaintiff's favor.[8] The Commission's findings and discussion differ from the position advanced by the same plaintiff in the instant litigation. Because the parties, subject matter, and legal issues before the Commission mirror those in the instant litigation, the court will closely canvass the Commission's opinion.

The procedural aspects of the case before the Commission reveal important details for this case. First, the original petition filed with the Commission included the Yampah, Cumumbah, and Weber Ute Bands. Plaintiff amended the petition to omit these bands and add the Seuvarit Band. 5 Ind.Cl.Comm. at 20–21. Thus, plaintiff did not allege continuity of identity with the Weber Utes, and the Commission did not discuss that band. Plaintiff alleged descent from the Uintah, Timpanoag, Pahvant, Sampitch, and Seuvarit Bands. The Commission listed, *inter alia*, seven issues for decision:

1) What area did plaintiff's ancestors occupy?

2) Did plaintiff hold aboriginal or Indian title to this area?

3) Is plaintiff tribe descended from those who aboriginally held the land?

4) Did plaintiff's ancestors divest themselves of any interest in the subject lands?

5) Is plaintiff estopped to assert its alleged claims by administrative ruling, prior litigation, or its conduct in accepting a share of the proceeds of various treaties and agreements?

6) What are the boundaries of lands occupied by plaintiff's ancestors?

7) What was the date of taking?

*Id.* at 21. In the course of the opinion, the Commission resolved all but the last issue, which it reserved for a later hearing.

### 1. *Aboriginal location and ethnic composition of the Uintah Band*

The Commission began by noting that the Uintah Band reside on the Uintah and Ouray Reservation with two other unrelated Ute Bands: the White River (formerly Yampa and Grand River) and Uncompahgre (formerly Tabeguache) Bands. 5 Ind.Cl.Comm. at 2. (In fact, the related litigation involved the settlement of these bands on the Uintah Reservation. *See supra* note 8.)

The primary issue involved determining the extent of plaintiff's aboriginal lands. Plaintiff proposed a large aboriginal area covering central and eastern Utah, as well as the entire Uintah and Ouray Reserva-

---

**8.** In a related case, the Commission also decided a dispute involving the Uintah and Ouray Reservation itself. *Uintah Ute Indians v. United States,* 5 Ind.Cl.Comm. 47 (1957).

tion. 5 Ind.Cl.Comm. at 22. It does not appear that plaintiff claimed aboriginal title to Salt Lake City. Plaintiff's amended petition to the Commission described the claimed northern boundary, as follows: "thence east from the Butterfield Peaks *along the summit of the mountain range separating the drainage area of the Utah and Great Salt Lakes* to the summit of the Uintah Mountains...." *Id.* at 22 (emphasis added). For its part, defendant denied aboriginal occupancy of the Uintah Valley. Defendant, however, admitted Uintah occupancy of central Utah to the west of the Wasatch Mountains. *Id.* at 23. The Commission agreed with all but the plaintiff's claimed eastern boundary, where the Seuvarits resided, and a portion of the southern boundary. In particular, the Commission noted that the areas around Utah and Sevier Lake in central Utah were "unquestionably Ute." *Id.* at 25. Notably, the Commission stated:

> The northern boundary of the Uintah Utes, starting at the northwest corner of the Uintah Valley Reservation, is formed by a part of the Uintah Mountains. The boundary on the north ... starts at the northwestern corner of the reservation and follows the crest of the Uintah Mountains to the south of the town of Oakley and continues to the Butterfield Peaks in the Oquirrh Mountains. As it proceeds southwesterly, the country opens up into valleys and there is no natural barrier. *However, the location of the Shoshoni to the east of the Great Salt Lake and around present Salt Lake City as opposed to the location of the Ute to the south around Utah Lake and Provo seems to indicate a sufficiently definite boundary to justify the division line being placed where it is....*

*Id.* at 43–44 (emphasis added).[9] The northern boundary of Uintah aboriginal lands was also described as running through the mountains which separate the Salt Lake and Utah Valleys. *Id.* at 6–7. Thus, the Commission found aboriginal title to an area largely to the west of the Wasatch and south of the Great Salt Lake. *Id.* at 2, 23–27.

### 2. *The Colorado and Utah Utes*

The second major dispute concerned whether the Uintahs were parties to treaties entered into with the Colorado Utes. These treaties provided for cession of aboriginal title and therefore would have defeated plaintiff's claims of a taking. The Commission found that in aboriginal times the Utah Utes included the following five groups: the Uintahs, located in the Uintah Valley; the Timpanoags located around Utah Lake; the Pahvants, located around Sevier Lake and Corn Creek; the Sampitches, located in San Pete County; and the Seuvarits, roaming in the area to the east of the Wasatch Mountains. 5 Ind.Cl. Comm. at 2. These groups ultimately merged under the common name of Uintah Utes. The Commission did not include the Weber or Cumumbah Utes in this amalgamation. Moreover, the Commission found that "on all four sides of their original lands ... [plaintiff tribe was] bounded by Indian peoples of a different language, or culture, or both." *Id.* at 4. The Shoshone inhabited the area west and north of plaintiff's lands. *Id.* at 5. This would encompass Salt Lake City. The Southern Paiutes occupied the area to the south while the Colorado Utes lived to the east, largely in the State of Colorado.

Some confusion existed regarding treaties entered into by the Colorado Utes because the documents listed the Uinta (the omission of the "h" is intentional) Utes as signatories.[10] 5 Ind.Cl.Comm. at 33. On this basis defendant argued before the Commission that the Uintah Utes of Utah had signed away their rights to aboriginal lands pursuant to these treaties. Plaintiff rejoined that the Uintah Band of Indians residing in Utah had no connection whatever with the Colorado Uintah Indians. *Id.* at

---

9. The Commission parenthetically noted that aboriginal lands delineated in its findings were well within the limits of lands described in the Spanish Fork Treaty. 5 Ind.Cl.Comm. at 12–13.

10. Further confusion resulted from the 1880 forced removal of the Colorado White River Ute Band to the Uintah and Ouray Reservation. 5 Ind.Cl.Comm. at 37–40.

33. The Commission found that plaintiff tribe constituted "a separate and distinct group from the Indians of Colorado who came to be known as the Grand River, Yampah, and Uintah Bands, and eventually as the White River Utes." *Id.* The Commission's opinion aptly chronicled this confusing ethnic history:

> There is naturally some confusion between these Indians because they were all Utes and prior to the coming of the white men there was no reason for them to avoid contact and also they were probably common victims of raids by the Shoshonies to the north. In other words, there was a common plane of interest upon which they undoubtedly met. However, with the establishment of Utah Territory in 1850, and Colorado in 1861, there came a definite division between the two groups as a result of the establishment of two superintendencies for the two groups of Indians. *We do not mean to say that there was not a separation prior to that time but rather that such separation became a matter of record through the reports of the respective superintendencies.*

5 Ind.Cl.Comm. at 33–34 (emphasis added).

Consequently, the Utah Uintah Band constituted a separate band from those Utes in Colorado and, one would presume, elsewhere. In fact, the Commission later went so far as to state that "the Uintahs of Utah have always been separate from" the White River, Southern, and Uncompahgre Utes. *Id.* at 42. Therefore, the Commission determined that the Uintah Utes did not sign the Treaty of March 2, 1868, 15 Stat. 619 (1868), in which various bands of Colorado Utes [11] ceded title to the United States. *Id.* at 33.[12] The Commission accordingly held that the Uintah Utes had aboriginal title to a defined area that they had not ceded. Moreover, the Commission concluded that the Government failed to pay compensation for land taken within the aboriginal lands. *Id.* at 40, 46. Therefore,

the Commission held the Government liable for the taking of the aboriginal lands described. The Commission left the extent of the taking and damages for a later hearing.

## DISCUSSION

The parties present three issues that must be decided: first, whether the Uintah Band of Ute Indians is related to the Utah Indians who signed the 1849 treaty upon which plaintiff now sues; second, whether the Uintah Band had unextinguished and/or recognized aboriginal title to the land ceded by the Government to the University of Utah; and third, whether plaintiff can maintain the instant action as a breach of trust suit. Before examining these issues, the court will address a dispositive issue that was mentioned in defendant's briefs and was discussed extensively during oral argument.

## I. ISSUE PRECLUSION AND THE INDIAN CLAIMS COMMISSION

Issue preclusion, or collateral estoppel, and the related doctrine of *res judicata* mandate that "a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties....'" *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (quoting *Southern Pac. R.R. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897)). In particular, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation...." *Montana,* 440 U.S. at 153, 99 S.Ct. at 973 (citing, *inter alia, Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979)); *see also Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569

---

**11.** These bands included the Tabeguache, Muache, Capote, Weeminuche, Yampa, Grand River, and Uintah Bands from Colorado.

**12.** In fact, the Commission's detailed research revealed that some Utah Utes were present during the treaty signing, but the Commission concluded that those Utah Utes could not bind their brethren in Utah. 5 Ind.Cl.Comm. at 36.

(Fed.Cir.1983). As a theoretical matter, issue preclusion frees the court and the parties from the onerous task of relitigating issues already decided. As the Court of Claims noted:

> [R]es judicata and its offspring, collateral estoppel, are not statutory defenses; they are defenses adopted by the courts in furtherance of prompt and efficient administration of the business that comes before them. They are grounded on the theory that one litigant cannot unduly consume the time of the court at the expense of other litigants, and that, once the court has finally decided an issue, a litigant cannot demand that it be decided again.

*Warthen v. United States,* 157 Ct.Cl. 798, 800 (1962). Even if the court disagrees with the factual findings or legal rulings, those findings or rulings remain binding, provided that the test for applying issue preclusion is met. *See United States v. Moser,* 266 U.S. 236, 242, 45 S.Ct. 66, 67, 69 L.Ed. 262 (1924) (erroneous view or erroneous application of law does not vitiate application of collateral estoppel).

▆▆▆ In order for issue preclusion to apply, the court must answer four questions in the affirmative: Are the issues to be decided identical in the two suits? Were these issues raised and actually litigated in the initial action? Was the court's determination of those issues necessary and essential to the previous judgment? Was the party to be precluded fully represented in the prior action? *Mother's Restaurant,* 723 F.2d at 1569. Thus, issue preclusion does not require identity of causes of action. The court will consider these questions serially.

### 1. *Identity of issues*

The court begins by examining the issues presented to the factfinders. Before the Commission, the parties disputed, and the Commission decided, the following issues: 1) What were the areas that plaintiff's ancestors aboriginally occupied? 2) Were plaintiff's ancestors legally capable of holding such title? 3) Did plaintiff tribe descend from its alleged ancestors? 4) Did the ancestors divest themselves of aboriginal title? 5) Was plaintiff estopped in this suit by previous litigation? 6) What were the boundaries of plaintiff's aboriginal land? *Uintah Ute Indians v. United States,* 5 Ind.Cl.Comm. 1, 21 (1957). In the instant case, issues before the court include the following: 1) Did plaintiff's ancestors sign the 1849 Treaty with the Utahs? 2) Did plaintiff aboriginally occupy the land encompassed within Fort Douglas? 3) Has plaintiff divested itself of title to that land? 4) Was plaintiff's title extinguished? The court concludes the Commission's resolution of issues 1 and 6 precludes litigation before the Court of Federal Claims of the composition of the band and the areas and boundaries of plaintiff's aboriginally occupied lands.

### a. *Aboriginal title*

The Commission made detailed findings with respect to plaintiff's aboriginal lands. In finding number 3, the Commission stated:

> 3. That at the time plaintiffs were deprived of their lands by defendant they were in the exclusive use and occupancy of lands lying within the following boundaries:
>
> Commencing at the northwest corner of the Uintah and Ouray reservation in the Uintah Mountains and running thence along the crest of said mountains through Clayton, Sunset and Lone Peaks and across Jordan Narrows, where Jordan River cuts through the mountains separating Salt Lake and Utah Lake valleys; thence along the crest of such mountains to Butterfield Peaks; thence along the crest of the Oquirrah Mountains to a point thereon due east of the town of Lofgreen. . . .

5 Ind.Cl.Comm. at 2. In fact, the northern aboriginal boundary found by the Commission was consistent with plaintiff's contentions at the time.

The described aboriginal land does not include the Salt Lake Valley and therefore does not include the land conveyed by the Government to the University of Utah. In this case plaintiff asks the court to desig-

nate the Salt Lake Valley as Uintah aboriginal land. The tribe thereby seeks to redefine and expand its aboriginal lands. For example, plaintiff presents documentary and anthropological reports showing Weber Ute occupancy of the Salt Lake Valley. Plaintiff classifies the Weber Utes as having merged into the Uintah Band.[13] In effect, plaintiff argues that the court should revisit the aboriginal boundaries established by the Commission in 1957 because the Weber or Cumumbah Utes constitute a sub-group amalgamated into the Uintah Band, along with other sub-groups, such as the Pahvants. Plaintiff further contends that the Weber Utes aboriginally occupied the Salt Lake Valley and Fort Douglas. In this manner plaintiff obtains aboriginal title to more than the Commission found in 1957. Plaintiff puts forth considerable effort to present the court with historical evidence to achieve a supplementation of a finding made by the Commission over 25 years ago.

Plaintiff acknowledges that in the 1950's the tribe argued for a northern boundary that did not include the Salt Lake Valley, but ascribes this position to counsel's concomitant representation of the Shoshone. According to Carl S. Hawkins, a law professor at Brigham Young University, then an associate in plaintiff's counsel's former law firm, the Utes' northern boundary (the court assumes that the affiant refers to the Uintah Band) contained a "region of intermixture" of Utes and Shoshone. Affidavit of Carl S. Hawkins, dated July 7, 1993, ¶ 6. Mr. Hawkins avers: "[I]f we attempted to define an exact boundary between the Shoshones and the Utes, the partners felt it would clutter the Northwestern Shoshone claim with an unnecessary distraction from the issues and delay resolution of that claim." Id. ¶ 7. Mr. Hawkins indicates

that ethnological evidence linked the Salt Lake Valley with both tribes. Due to a perceived conflict of interest, plaintiff's former counsel decided not to argue for the inclusion of the Salt Lake Valley within plaintiff's aboriginal lands. Mr. Hawkins avers that plaintiff's former counsel therefore drew the Uintah's northern boundary between Utah Valley and the Salt Lake Valley.

While Mr. Hawkins' affidavit does raise troubling questions regarding his firm's representation of the Uintah Band,[14] it does not affect the identity of issues in the case before the Commission and the case at bar. At this stage in the analysis, the question is not whether a Uintah Band did inhabit Salt Lake Valley, but whether the issues in the two cases are identical. The Hawkins affidavit supports a conclusion that the issue of the scope of Uintah aboriginal lands was present in both the Commission proceeding and the instant case.

### b. *Sub-groups included within the Uintah Band*

In order to draw aboriginal boundaries, the Commission had to determine which sub-group bands merged into the Uintah Band. Before the Commission plaintiff withdrew the Weber Utes as a plaintiff; therefore, the Commission found that the Uintah Ute Band contained the following sub-groups: Uintahs, Timpanoags, Pahvants, Sampitches, and Seuvarits. 5 Ind.Cl. Comm. at 2–3. The Commission did more than merely accept plaintiff's representations. The Commission also separately found that "[t]o the west and north of the original habitat of the plaintiffs lived various bands of Shoshone Indians...." Id. at 5. Moreover, as previously noted, the Commission opined that the Shoshone inhabited the region around the Great Salt

---

13. Plaintiff's historical data also indicate that the Weber Utes may more properly be classified as Shoshone or mixed Shoshone–Ute. In any event, plaintiff maintains that they integrated into the Uintah Band.

14. The court observes that former counsel's representation of two Indian tribes which had claims to the same land raised a potentially disqualifying conflict of interest issue. Even if the Uintah Band consented to such representa-

tion, the court finds it difficult to understand why the Band would consent to a reduction in its aboriginal lands. How Mr. Hawkins' firm procured the Weber Utes' consent to withdraw as a plaintiff is also mystifying. Apparently neither the Commission nor the parties raised these concerns, and plaintiff is bound by the decades-old tactical decisions of its former counsel.

Lake and present Salt Lake City, whereas the Utes resided around Provo and Utah Lake. *Id.* at 44. In the instant case, plaintiff, on the basis of historical and documentary evidence, asks the court to include the Weber Utes within the Uintah Band as part of the court's analysis of plaintiff's aboriginal lands. Thus, the composition of the Uintah Band is also an identical issue before the Commission and the court.

### 2. *Issues raised and litigated*

The second prong of the issue preclusion test requires the court to examine whether the parties disputed an issue and whether the trier of fact resolved it. *Mother's Restaurant*, 723 F.2d at 1570. For the most part, the Commission's findings and opinion do not indicate the areas of disagreement between the parties. Indeed, defendant admitted the occupancy of the areas west of the Wasatch occupied by the Timpanoag, Pahvant, and Sampitch Utes. 5 Ind.Cl. Comm. at 23. Defendant did dispute whether plaintiff tribe occupied the areas east of the Wasatch. *Id.* Defendant also disputed whether plaintiff occupied the Uintah Valley. *Id.* at 26–27. Resolution of these disputes necessarily involved identifying the sub-groups that comprised plaintiff band. The Commission resolved both of these disputes in connection with its overall determination of the aboriginal area. Thus, defendant disputed plaintiff's aboriginal boundaries and the Commission resolved these disputes. The parties did not stipulate to any issues, which indicates that defendant required plaintiff to present evidence and thereby to litigate the issues.

### 3. *Necessary and essential to the prior judgment*

The determination of the issues in the prior action must have been necessary and essential to the Commission's decision. *Mother's Restaurant*, 723 F.2d at 1571 (citing cases). As the Federal Circuit stated:

[T]he requirement that a finding be 'necessary' to a judgment does not mean that the finding must be so crucial that, without it, the judgment could not stand. Rather, the purpose of the requirement is to prevent the incidental or collateral determination of a non-essential issue from precluding reconsideration of that issue in later litigation.

*Id.* (citations omitted). The Commission's delineation of plaintiff's aboriginal boundaries and its determination of which groups comprised the Uintah Band formed crucial underpinnings of the Commission's opinion. In order to adjudicate plaintiff's takings claim, the Commission faced the *sine qua non* of determining the boundaries of the band's aboriginal lands, if any. Moreover, this inquiry depended on which groups comprised the Uintah Band. If the Webers formed a constituent part of the Uintah Band, then additional aboriginal lands would come into play. Neither the defining of plaintiff's aboriginal lands nor the enumeration of which groups formed the Uintah Band can be considered incidental, collateral, or non-essential to the Commission's decision.

### 4. *Full representation*

The fourth prong of issue preclusion requires the court to analyze whether plaintiff tribe was fully represented in the Commission case. Though it appears that plaintiff's former counsel ill-served at least his Weber Ute clients, the court notes that plaintiff prevailed in the Commission case in which a large portion of Utah was included within the tribe's aboriginal lands. The court cannot conclude that plaintiff was not fully represented in the Commission case.

### 5. *Special circumstances/change in controlling facts or legal principles*

■ Exceptions exist to invocation of issue preclusion when special circumstances merit or when facts or legal principles have significantly changed since the prior judgment. These exceptions apply, however, only when unrelated subject matter arises in subsequent cases between the same parties involving similar issues. *Montana*, 440 U.S. at 162, 99 S.Ct. at 978.

The court is satisfied that the Commission acted as a court of competent jurisdiction. In particular, the Commission's enabling statute provided that the Commis-

sion could adjudicate "claims arising from a taking by the United States." Indian Claims Commission Act, ch. 959, § 2(4), 60 Stat. 1050, codified at 25 U.S.C. § 70a (1976) (omitted 1978). The Commission's judgments had the effect of a final judgment of the Court of Claims and, upon payment to the plaintiff tribe, constituted a full discharge of all matters in controversy. § 22(a), 60 Stat. 1055, codified at 25 U.S.C. § 70u. Furthermore, the Act provided that "[a] final determination against a claimant made and reported in accordance with ... [the] Act shall forever bar any further claim or demand against the United States arising out of the matter in controversy." § 22(b), 60 Stat. 1055, codified at 25 U.S.C. § 70u.

The court recognizes that plaintiff's present cause of action allegedly matured in 1991 and therefore could not have been brought prior to 1951, the expiration date for claims presented to the Commission. Issue preclusion does not bar future claims, but it does bar relitigating issues, even if they are presented later as wholly new theories or causes of action. The doctrine of issue preclusion thus forecloses plaintiff from relitigating the same issues that it could, or should, have framed more broadly when the issues concerning the lands aboriginally occupied by plaintiff's ancestors and the boundaries of those lands were litigated fully and decided over 35 years ago. The court concludes that the Commission finally decided the issues of aboriginal title and the constituent subgroups included within the Uintah Band. Plaintiff is precluded from arguing that it retained aboriginal title to the subject land of Fort Douglas and from alleging that the Weber Utes form a constituent part of the Uintah Band. Consequently, plaintiff cannot maintain the present action for a breach of trust or a constitutional taking of a right to trust protection as to the subject land.

## II. JURISDICTION

■ Because it is not dispositive, jurisdiction, the *force majeure* of all legal defenses, does not receive priority treatment in this opinion. The resolution of this issue involves 28 U.S.C. § 1505 (1988), which provides, *inter alia*, that the Court of Federal Claims has jurisdiction over Indian claims "whenever such claim is one arising under the Constitution, laws or treaties of the United States, or executive orders of the President...." Thus, an Indian tribe must demonstrate that the Constitution, a law, or a treaty can be interpreted to mandate compensation in order for the court to have jurisdiction. *United States v. Mitchell*, 463 U.S. 206, 216–18, 226, 103 S.Ct. 2961, 2967–69, 2973, 77 L.Ed.2d 580 (1983) (commonly referred to as *"Mitchell II"*).

### 1. Were plaintiff's ancestors parties to the 1849 treaty?

■ Plaintiff alleges that the tribe is "treaty heirs of the 'Treaty with the Utah, 1849' ... entered into ... between defendant ... and certain bands of Indians, including the ancestors of plaintiff...." Compl. filed June 25, 1992, ¶ 1. Defendant moves to dismiss for lack of subject matter jurisdiction, arguing that plaintiff cannot base its cause of action on a treaty, as required by 28 U.S.C. §§ 1491(a)(1), 1505.

Defendant's version of these century-old historical events recounts that the 1849 Treaty with the Utahs included Utes from New Mexico and Colorado, not Utah. The Utah Utes and Colorado/New Mexico Utes lived separate existences, and the Government treated with each group individually. Defendant points to several provisions in the 1849 treaty. Acknowledging that the treaty does not actually describe the land occupied by the Utah Indians, defendant notes that the parties signed the treaty in Abiquin, New Mexico Territory, and that the treaty provided for the annexation to the New Mexico Territory of all the Utah Indian lands. This, defendant asserts, shows that the Government treated with, and extinguished the territorial claims of, Indians who occupied lands in or near New Mexico. In addition, defendant points to the unratified Spanish Fork Treaty with the Uintah Utes, which also provided for the extinguishment of aboriginal title. According to defendant, this treaty manifests

the Government's separate view of the Utah and Colorado/New Mexico Indians.

Plaintiff responds with a veritable plethora of historical evidence. Plaintiff points to the Commission's determination that the Colorado and Utah Utes existed separately and independently of each other. Plaintiff maintains that until at least 1850, when Congress created the Utah Territory, the Government considered all Utahs, wherever residing, as Utahs. After that point, or as late as 1861 when Congress created the Colorado Territory out of the Utah Territory, the Government treated the two groups separately. Hence, an 1849 treaty with "Utahs" perforce includes all Utahs within the United States. Plaintiff cites the Commission's historical account of the Utah and Colorado Utes as separate entities only after 1850 or 1861. Plaintiff also points to contemporaneous accounts describing the negotiator's view that "Utahs" comprised all the Utah Indians in the United States at the time of the treaty.

■■■ In ruling on a motion to dismiss for lack of subject matter jurisdiction, the court normally accepts as true the nonmovant's undisputed allegations of fact and construes them in a light most favorable to plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir. 1988). However, when there exist disputed facts relating to the court's jurisdiction, the court may consider evidence outside the pleadings in order to resolve the dispute. *Rocovich v. United States*, 933 F.2d 991, 994 (Fed.Cir.1991); *Indium Corp. v. Semi–Alloys, Inc.*, 781 F.2d 879, 884 (Fed.Cir. 1985), *cert. denied*, 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986); *Reynolds*, 846 F.2d at 747. The nonmoving party bears the burden of proving subject matter juris-

diction. *Rocovich*, 933 F.2d at 993; *Reynolds*, 846 F.2d at 748. Plaintiff has put forward sufficient facts to warrant trial on the issue of subject matter jurisdiction were the matter to proceed further.

This case presents the court with the first treaty entered into with any Ute band. This much, at least, is certain. Each party presents seemingly legitimate historical evidence. On the one hand, defendant argues deductively that the parties signed the treaty in present-day New Mexico. The treaty provided for cession of all Indian lands to the New Mexico Territory. Therefore, the treaty must apply only to those Utes residing in New Mexico. Plaintiff, which bears the burden, sets forth the thoughts of the Government's negotiator, Commissioner of Indian Affairs James S. Calhoun, who indicates that he thought that he treated with all Utahs. Plaintiff also cites the Bureau of American Ethnology and an historical account of the Utes to similar effect.

The court deems plaintiff's authorities sufficient, in the present posture of the case, to survive defendant's jurisdictional motion. Mindful that it is not beyond doubt that plaintiff can prove no set of facts which would entitle it to relief, *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989), the court concludes that plaintiff has met its burden. While defendant's deductive argument has merit, the court cannot ignore plaintiff's well-researched history indicating that the Government did not separately deal with the Utah and Colorado Utes until at least 1850, one year after the treaty at issue. The court does not intimate that plaintiff presents a conclusive history; nonetheless, the history presented satisfies the court that it is at least possible that plaintiff could have proved a set of facts entitling the tribe to pursue relief in the Court of Federal Claims.[15]

---

**15.** Plaintiff contends that the treaty creates a trust relationship violated by the Government when it conveyed land to the University of Utah. Because the precedents dictate a liberal reading of Indian treaties, *Choate v. Trapp*, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912), the court does not insist on a strict interpretation of the 1849 treaty. The court does not read the 1849 treaty to mandate compensation if a party

breaches the treaty. *Cf. Mitchell*, 463 U.S. at 218, 103 S.Ct. at 2968 (stating that "a court must inquire whether the source of substantive law [in this case, the 1849 treaty] can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained...."). The 1849 treaty is a peace treaty; it does not provide for annual payments, a reservation, or specify rights or obligations.

## III. THE PARTIES' CONTENTIONS ON THE MERITS

 Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Defendant, as the moving party, has the burden of establishing the absence of disputed genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In the capacity of opposing defendant's motion, plaintiff has the burden of providing sufficient evidence to show that a genuine issue of material fact indeed exists. *Id.*, at 322, 324, 106 S.Ct. at 2552, 2553.

 In resolving defendant's motion, the court cannot weigh the evidence and determine the truth of the matter on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255, 106 S.Ct. 2505, 2510, 2514, 91 L.Ed.2d 202 (1986). Any evidence presented by the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2514. Summary judgment pursuant to RCFC 56 properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984).

Defendant essentially asks for summary judgment on the basis that plaintiff's theories of relief, measured against all the evidentiary materials submitted by the parties, do not state claims upon which relief can be granted. The facts in dispute between the parties are not dispositive. The inquiry on this motion for summary judgment is whether, affording plaintiff the presumptively favorable view of the facts to which it is entitled, defendant has discharged its burden of showing that it is entitled to judgment as a matter of law.

At oral argument plaintiff presented a novel and ingenious theory of recovery not completely addressed in its briefs. Plaintiff sues for an alleged breach of trust that occurred when the Government deeded certain land to the University of Utah. However, during argument, plaintiff moved to amend its complaint to allege a taking without just compensation under the fifth amendment to the U.S. Constitution. Plaintiff's argument may be summarized, as follows: As part of its breach of trust action, plaintiff argues that the 1849 treaty recognized Indian title and provided for the permissive occupation by the Government of certain Indian lands on which to build agencies and military outposts. These outposts, plaintiff argues, provided benefits to both settlers and Indians by keeping the peace. Plaintiff posits that the 1849 treaty created a trust relationship between the Government and the Uintahs as to those lands. Plaintiff urges that the treaty also vested in plaintiff a right to that trust protection. In other words, when the Government's permissive use ceased, the land would revert to the Indians. The congressional authorization for and subsequent 1991 conveyance of land from the Government to the University of Utah breached this trust. In this fashion plaintiff seeks to avoid the issue preclusion bar on ripeness grounds, arguing that plaintiff could not have presented this cause of action to the Commission because, until 1991, the Government dutifully held the subject land in trust for plaintiff. Plaintiff would plead that the 1991 authorization and conveyance unconstitutionally took plaintiff's right to trust protection.

Defendant rejoins that *Menominee Tribe v. United States*, 221 Ct.Cl. 506, 607 F.2d 1335 (1979) (en banc), *cert. denied*, 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980), forecloses plaintiff's new theory and thus renders amendment futile. *Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1403–04 (Fed.Cir.1989) (holding that futility of amendment constitutes a valid reason for denying leave to amend). *Menominee* held that the Court of Claims lacked jurisdiction over a non-constitutional claim that a congressional act breached a trust relationship to an Indian tribe. 221 Ct.Cl. at 511–18, 607 F.2d at 1338–43.

Plaintiff responds in two ways. First, plaintiff distinguishes *Menominee* by asserting that the 1991 authorizing legislation does not conflict with the 1849 treaty, because the subject congressional act does not explicitly extinguish plaintiff's right of occupancy. Second, plaintiff posits that it would plead a constitutional claim, *i.e.,* a taking.[16] Still, the gravamen of plaintiff's proposed claim is that the Government breached its trust by enacting legislation that had the effect of taking plaintiff's land. Defendant rebuts the constitutional claim by citing *Tee–Hit–Ton Indians v. United States,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), and *Inupiat Community v. United States,* 230 Ct.Cl. 647, 680 F.2d 122, *cert. denied,* 459 U.S. 969, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982), for the proposition that no taking occurs when the Government exercises its sovereign prerogative to extinguish unrecognized Indian title. Plaintiff puts forward *Choate v. Trapp,* 224 U.S. 665, 678, 32 S.Ct. 565, 570, 56 L.Ed. 941 (1912), which held that Congress could not unilaterally abrogate a vested property right. Plaintiff also points to 1865 legislation authorizing the Government to negotiate treaties to extinguish title. According to plaintiff, congressional authorization therefore could not have the effect of extinguishing Indian title.

## IV. ABORIGINAL TITLE

 Aboriginal title denotes an interest that an Indian tribe possesses in land based solely on rights acquired by the Indians as original inhabitants of the land and not upon a statute, treaty, or grant by the sovereign. As early noted by the Supreme Court, the first settlers on the North American continent established relations with the Native Americans where

> the rights of the original inhabitants were, in no instance, entirely disregarded; but were necessarily, to a considerable extent, impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as just claim to

retain possession of it, and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil at their own will, to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it.

*Johnson and Graham's Lessee v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 574, 5 L.Ed. 681 (1823). Aboriginal title has also been called "the right of use and occupancy" "original title," and "Indian title." *Sac & Fox Tribe v. United States,* 179 Ct.Cl. 8, 20–21, 383 F.2d 991, 997, *cert. denied,* 389 U.S. 900, 88 S.Ct. 212, 19 L.Ed.2d 217 (1967). Aboriginal title does not grant the Indian a property right. *Tee–Hit–Ton Indians,* 348 U.S. at 279, 75 S.Ct. at 317. Rather, aboriginal title provides a given tribe with rights as against all except the sovereign. *Id.* The Supreme Court held in *Tee–Hit–Ton Indians* that the sovereign will protect the Indians' right of occupancy "against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians." *Id.*

 Establishing aboriginal title requires proof " 'of actual, exclusive and continuous use and occupancy 'for a long time' prior to the loss of the land.' " *United States v. Pueblo of San Ildefonso,* 206 Ct.Cl. 649, 669, 513 F.2d 1383, 1394 (1975) (quoting *Confederated Tribes of the Warm Springs Reservation v. United States,* 177 Ct.Cl. 184, 194 (1966)); *see United States v. Santa Fe Pac. R.R.,* 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941) (describing aboriginal possession as "definable territory occupied exclusively by the ... [Indians]"). A court treats aboriginal title as a factual question. *Id.* A tribe must prove exclusive possession of a parcel, *i.e.,* " 'that it used and occupied the land to the exclusion of other Indian groups.' " *Strong v.*

---

**16.** At argument plaintiff styled the proposed amended claim as a "taking of a right to trust

protection."

*United States*, 207 Ct.Cl. 254, 261, 518 F.2d 556, 561 (quoting *Pueblo of San Ildefonso*, 206 Ct.Cl. at 669, 513 F.2d at 1394), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975). Therefore, mixed use of a given parcel "precludes the establishment of any aboriginal title," *Strong*, 207 Ct.Cl. at 260, 518 F.2d at 561, unless the tribes occupy a defined area in joint and amicable possession. *Confederated Tribes*, 177 Ct.Cl. at 194. To establish "use and occupancy," a tribe usually provides evidence regarding its way of life, habits, customs, and usages of the land. *Mitchel v. United States*, 34 U.S. (9 Pet.) 711, 746, 9 L.Ed. 283 (1835); *Sac & Fox Tribe*, 179 Ct.Cl. at 21–22, 383 F.2d at 998. "A long time" has been defined as long enough that the Indians have made the area into domestic territory. *Confederated Tribes*, 177 Ct. Cl. at 194.[17]

 Plaintiff also must establish that the Government recognized its alleged aboriginal lands in order to recover compensation for a taking. *Tee–Hit–Ton Indians*, 348 U.S. at 284–85, 75 S.Ct. at 319–20. Plaintiff maintained that compensation for the taking of aboriginal lands does not depend on recognition of such lands via treaty, congressional act, or otherwise.[18] Plaintiff is incorrect. Although in 1835 the Supreme Court stated that the Indian "right of occupancy is considered as sacred as the fee-simple of the whites," *Mitchel*, 34 U.S. (9 Pet.) at 746, without recognized or acknowledged title, an Indian tribe cannot recover compensation for a fifth amendment taking. *Tee–Hit–Ton Indians* emphasized that aboriginal title does not create a compensable property right. 348

U.S. at 279, 75 S.Ct. at 317. Because aboriginal title constitutes "mere possession not specifically recognized as ownership by Congress," the Government may terminate an Indian tribe's unrecognized right of occupancy without compensating the tribe for the land. *Id.* at 279, 284–85, 75 S.Ct. at 317, 319–20.[19]

Plaintiff responds that the manner in which the Government extinguishes Indian title no longer is considered to raise political, non-justiciable questions. Plaintiff points out that *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73, 83–85, 97 S.Ct. 911, 918–19, 51 L.Ed.2d 173 (1977), and *Littlewolf v. Lujan*, 877 F.2d 1058, 1064 (D.C.Cir.1989), *cert. denied*, 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 832 (1990), overruled the political question doctrine in Indian cases. Therefore, plaintiff insists that the court can hear its taking claim, even if it only rests on unrecognized aboriginal title.

Although plaintiff correctly states that *Littlewolf* and *Weeks* represent the demise of the political question doctrine in these cases, this court's ruling that unrecognized aboriginal title vests no compensable property right does not rest on an application of the political question doctrine. Instead, the law is that without a property right, no compensation is due under the fifth amendment. The existence of a property right does not depend on the justiciability of plaintiff's claim. Courts have abstained from ruling on the manner, method, and time of extinguishment of Indian title because those issues remained the exclusive province of the legislative branch. That these issues became justiciable after 1977

---

17. At least one case intimated that 20 years' use and occupancy satisfied the "long time" requirement. *Sac & Fox Tribe*, 179 Ct.Cl. at 23, 383 F.2d at 999.

18. The court recognizes that plaintiff pleads a taking of a right of trust protection. The court first addresses the general issue of takings in the context of Indian property rights. In a subsequent section, the court discusses plaintiff's novel arguments regarding the taking of a right of trust protection. This approach allows the court to consider both the parties' arguments in their briefs and those made orally before the court.

19. The Indian Claims Commission cases represent a significant departure from this rule because the Commission's enabling jurisdiction granted it the power to hear cases in which the tribe indicted the Government's "fair and honorable dealings." Indian Claims Commission Act, ch. 959, § 2(5), 60 Stat. 1050, codified at 25 U.S.C. § 70a (1976) (omitted 1978). As a result, the Commission could find a taking when a given plaintiff could only demonstrate unrecognized aboriginal title. The Court of Federal Claims operates under different, less permissive constraints.

did not transform unrecognized Indian title into a compensable property right.

### 1. Does the 1849 treaty recognize plaintiff's alleged aboriginal title?

In order for plaintiff to proceed with its takings claim, were its claim not otherwise barred, plaintiff must demonstrate that the 1849 treaty or some other congressional act recognized its alleged aboriginal title. Recognition of Indian title may take various forms, but such recognition must manifest a definite intention to accord legal rights. *Tee–Hit–Ton Indians,* 348 U.S. at 278–79, 75 S.Ct. at 317; *Strong,* 207 Ct.Cl. at 265, 518 F.2d at 563; *Miami Tribe v. United States,* 146 Ct.Cl. 421, 439–46, 175 F.Supp. 926, 936–40 (1959). In other words, "Congress must affirmatively intend to grant the right to occupy and use the land permanently." *Sac & Fox Tribe v. United States,* 161 Ct.Cl. 189, 197, 315 F.2d 896, 900, *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963).[20] The court must determine whether the 1849 treaty, or some other clear congressional act, recognized plaintiff's aboriginal title to the area of Fort Douglas deeded to the University of Utah in 1991.

Plaintiff argues that the 1849 treaty recognized plaintiff's title to the subject lands. An examination of the treaty reveals no such acknowledgement. The treaty does state that the Utah tribe occupies some land; however, the boundaries and location of that territory are not defined. Treaty with the Utah, Dec. 30, 1849, art. IV, 9 Stat. 984. Moreover, the treaty indicates that, whatever lands the tribe may have occupied at the time, the boundaries of that territory in 1849 had not been determined. In pertinent part the treaty provides that

the aforesaid Government shall, at its earliest convenience, designate, settle, and adjust their territorial boundaries.... And the said Utahs, further, bind themselves not to depart from their accustomed homes or localities unless specifically permitted by an agent of the aforesaid Government; and so soon as their boundaries are distinctly defined, the said Utahs are further bound to confine themselves to said limits ... and they now deliberately and considerately, pledge ... to confine themselves strictly to the limits which may be assigned them....

Treaty with the Utah, Dec. 30, 1849, art. VII, 9 Stat. 985. Article VII of the 1849 treaty does not recognize title because the boundaries of aboriginal lands were to be settled in the future. By its terms the treaty does not designate, settle, adjust, define, or assign limits or boundaries to plaintiff; it leaves such matters to the future. Consequently, the treaty cannot be said to recognize Indian title.

By the same token, the court cannot accept the contention that, by failing to designate boundaries, the treaty recognizes title to whatever lands plaintiff occupied in December 1849. "[W]hen Congress intends to delegate power to turn over lands to the Indians permanently, one would expect to and doubtless would find indications of such purpose." *Hynes v. Grimes Packing Co.,* 337 U.S. 86, 104, 69 S.Ct. 968, 979, 93 L.Ed. 1231 (1949) (footnote omitted). Congressional intent to recognize Indian title must be definite. *Tee–Hit–Ton Indians,* 348 U.S. at 278–79, 75 S.Ct. at 317. For example, in *Miami Tribe,* where the Treaty of Greenville referred to the Government's "relinquishment" of claims to certain lands and where the Government granted the tribe lands "as long as they please," the court held that such language constituted a clear indication of the Government's intent to recognize title. 146 Ct.Cl. at 429–30, 440–41, 175 F.Supp. at 930–31, 937; *cf. Strong,* 207 Ct.Cl. at 265–66, 518 F.2d at 563–64 (holding that even a guarantee of "territorial rights" constitutes only a declaration of intention to respect Indian title as against third parties). In this case Con-

---

**20.** It follows from these propositions that statements by government officials regarding Indian title cannot form the basis for a finding of recognized title. While Mr. Calhoun's statements following the 1849 treaty are sufficient to create a genuine issue as to which Indians were parties to the treaty, these statements cannot create recognized title absent congressional action.

gress did not accord legal rights to the Utah Indians. The ratified treaty allowed the Indians permissive occupation and reserved a final settlement sometime in the future.

### 2. *Was plaintiff's aboriginal title extinguished?*

Since aboriginal title may form the basis for a fifth amendment takings claim, assuming that it is recognized, the court will address whether plaintiff has a valid claim to aboriginal title. For the purposes of this discussion, the court also assumes that the Weber or Cumumbah Utes formed a constituent part of the Uintah Band and that they occupied the subject area.

The Government can extinguish aboriginal title in various ways. Generally, the failure of an Indian tribe to satisfy any of the elements of aboriginal possession will defeat an aboriginal title claim. In particular, a tribe must demonstrate actual and continuous possession up until the date of the alleged taking. Therefore, the sovereign's exercise of complete dominion adverse to the Indian right of occupancy defeats a claim to aboriginal title. *Quapaw Tribe v. United States*, 128 Ct.Cl. 45, 49, 120 F.Supp. 283, 286 (1954), *overruled on other grounds, United States v. Kiowa*, 143 Ct.Cl. 545, 166 F.Supp. 939 (1958), *cert. denied*, 359 U.S. 934, 79 S.Ct. 650, 3 L.Ed.2d 636 (1959).

> [W]hen an Indian tribe ceases for any reason, by reduction of population or otherwise, to actually and exclusively occupy and use an area of land clearly established by clear and adequate proof, such land becomes the exclusive property of the United States as public lands, and the Indians lose their right to claim and assert full beneficial interest and ownership to such land; and the United States cannot be required to pay therefor on the same basis as if it were a recognized treaty reservation.

128 Ct.Cl. at 49, 120 F.Supp. at 286 (citations omitted). Various actions that end actual, exclusive, and continuous use of the land by the Indians can extinguish aboriginal title. *Pueblo of San Ildefonso*, 206 Ct.Cl. at 661, 513 F.2d at 1390. However, extinguishment of Indian title "cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." *Santa Fe*, 314 U.S. at 354, 62 S.Ct. at 255.

Contrary to plaintiff's contention, the 1865 Act regarding extinguishment, ch. 45, 13 Stat. 432, does not mandate that the Government extinguish Indian title only by treaty. The Act specifies that if the President enters into treaties with Indians in the Utah territory, such treaties shall provide for extinguishment of Indian title. Other methods of extinguishment would still be effective, the statute notwithstanding.

The undisputed facts reveal that plaintiff has not been in possession of the subject lands since 1872, if not before. Plaintiff, in effect, concedes that it has not actually, exclusively, and continuously occupied the subject land up to 1991, the alleged taking date. Plaintiff may have held the requisite occupancy until 1872 at the latest. (It would seem that 1872 is a more appropriate taking date.) Be that as it may, plaintiff seems to argue that the Government acted as an Indian proxy until 1991, thus obviating the bar of the statute of limitations. Without actual and continuous Indian use, however, the court cannot find aboriginal possession. In fact, the mere establishment of the fort in 1862, its official inauguration in 1867, and its expansions in 1887 and 1890, alone or in concert, would constitute dominion adverse to Indian title. Even if Indians continued to occupy some portions of the Fort's land (which plaintiff has not alleged), a military base destroys the exclusivity prong of the aboriginal title test.[21] That the Government

---

**21.** Plaintiff presented evidence to the court of substantial mixed-tribal use of the subject area, namely by Shoshone and Weber Utes. This would impact plaintiff's allegation of exclusive use. While the court does not have the benefit of a complete record in this regard, the evidence suggests that plaintiff would face a serious obstacle in proving joint and amicable use of the Salt Lake Valley area by the two groups. Even if the bands lived in joint and amicable possession, the court would also inquire into the composition of the Weber Utes, since they are vari-

established a military outpost is even more inconsistent with Indian title than occupation by white settlers. *See United States v. Gemmill,* 535 F.2d 1145, 1148–49 (9th Cir.) (holding that forced expulsion of Indians followed by Government use of land extinguishes Indian title), *cert. denied,* 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976); *Pueblo of San Ildefonso,* 206 Ct.Cl. at 661, 513 F.2d at 1390 (holding the impact of white settlement a factor in extinguishment of Indian title). In these circumstances the court concludes that the creation, occupation, and Indian departure from the lands encompassed in Fort Douglas extinguished any aboriginal title to the subject land.

## V. TRUST PROTECTION AND THE 1849 TREATY

Plaintiff argues that the 1849 treaty created a trust relationship between plaintiff and the Government as to any military outposts constructed on plaintiff's aboriginal lands and that the Government breached this trust (and took plaintiff's right to trust protection) when it conveyed the subject land to the University of Utah. As previously explained, the undisputed evidence presented by the parties in connection with defendant's dispositive motion does not support a finding that plaintiff had aboriginal title after 1862 at the earliest and 1867 at the latest.[22] Moreover, assuming that plaintiff had aboriginal title, that title was never recognized. Here, however, plaintiff subtly blends aspects of aboriginal title and constitutional takings analysis with accepted breach of trust doctrine into a novel cause of action.

### 1. *Treaty Interpretation: Does it create a trust relationship?*

■ As a threshold proposition, plaintiff argues that the 1849 treaty vested a property right in plaintiff such that the Government would hold the Fort Douglas land in trust until the Government ceased

ously described as Ute, mixed-blood, and Shoshone.

**22.** The evidence discloses that plaintiff had not left the area by the later of these dates, but the establishment of Fort Douglas defeats a claim to

using the land. The court carefully has examined this issue and concludes that the 1849 treaty created no such trust relationship as to the land encompassed within Fort Douglas.

■ A court can infer the existence of a trust relationship from the nature of the transaction or activity at issue. *Navajo Tribe v. United States,* 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980). A trust relationship does not depend for its existence on express language in a treaty or statute. *Id.* However, a court may look to

> language contained in the treaty … under which the claim is brought to ascertain whether there exists, (1) a legal relationship wherein the United States is in fact and law a trustee, fiduciary or guardian, or (2) a general relationship without any of such attributes or obligations, but which is described in the same terms by the courts….

*Sac & Fox Tribe,* 179 Ct.Cl. at 27, 383 F.2d at 1001. A trust relationship exists only with respect to tribal lands. *Navajo Tribe,* 224 Ct.Cl. at 183, 624 F.2d at 987; *Sac & Fox Tribe,* 179 Ct.Cl. at 27, 383 F.2d at 1001.

Notwithstanding these decisions, plaintiff relies on the 1849 treaty to create a trust relationship, pointing to no other facts showing such a relationship as to the specific lands at issue. However, as discussed *supra* at pp. 786–87, the 1849 treaty does not designate aboriginal lands. Rather, the treaty reserves for a future date the final delineation of boundaries. Whether or not the Government and plaintiff ever entered into a general trust relationship, the lands at issue could not have constituted part of that trust, because the Government never recognized or described Fort Douglas as aboriginal land. The 1849 treaty itself only generally refers to a guardian relationship between the Government and the Utahs. *See* Treaty with the Utahs,

exclusivity. Alternatively, plaintiff would claim that aboriginal title had been achieved by the earlier date, but the establishment of Fort Douglas would have extinguished it.

Dec. 30, 1849, art. IV, 9 Stat. 984. The treaty contains no obligations with respect to property. The article providing for the creation of military outposts does not refer to Indian lands, nor does it provide that the land occupied by such outposts would be held in trust for plaintiff. Art. VI, 9 Stat. 985. It would seem that the absence of provisions establishing obligations as to defining property emanated from the fact that the parties agreed to postpone boundary determinations. Once the Government established boundaries, a trust relationship could exist as to plaintiff's aboriginal land. The Government never did so until it created plaintiff's reservation in 1864. The record does not admit of a finding that the 1849 treaty created a trust relationship or trust protection as to the land conveyed by the Government to the University in 1991.[23]

### 2. Taking of a right of trust protection and/or breach of trust relationship

 Even if the court were to find a trust relationship as to the Fort Douglas land, plaintiff's cause of action cannot overcome the jurisdictional bar put in place by the Court of Claims. In *Menominee* the Court of Claims held that it had no jurisdiction to entertain nonconstitutional claims that Congress breached a trust relationship. 221 Ct.Cl. at 510–18, 607 F.2d at 1338–43. Plaintiff's breach of trust action cannot survive because it does not derive from a constitutional violation. To the extent that plaintiff alleges that the conveyance, not the congressional authorization, breached a trust relationship, the result remains the same: The congressional authorization provided the essential impetus for the deeding of the land to the University.

Plaintiff's constitutional gloss on the breach of trust claim does not withstand close scrutiny. As discussed above, plaintiff cannot claim a taking of unrecognized aboriginal title. This has several implications. First, it undermines plaintiff's cause of action for a constitutional taking, because plaintiff's aboriginal title, if any, has never been recognized. Second, it renders inapposite *Choate*, 224 U.S. at 665, 32 S.Ct. at 565, because plaintiff has no vested property interest in unrecognized aboriginal title. *Choate* stands for the proposition that Congress cannot destroy existing property rights acquired under a statute or agreement with the Government. 224 U.S. at 678, 32 S.Ct. at 570. Here, the 1849 treaty did not accord plaintiff any rights as to the land encompassed in Fort Douglas because it did not recognize or denote aboriginal title in any fashion whatsoever.

Plaintiff moved orally to amend its complaint to allege a taking. Because the court finds plaintiff cannot allege a taking, an amendment at this time would be futile. *Mitsui Foods*, 867 F.2d at 1403–04. Accordingly, the court denies plaintiff's motion to amend.

### CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted because plaintiff is precluded by the doctrine of collateral estoppel from relitigating issues decided by the Indian Claims Commission. Alternatively, defendant is entitled to a grant of summary judgment because plaintiff's breach of trust and takings theories are not actionable.[24] The Clerk of the Court shall dismiss the complaint.

**23.** No other evidence in the record before the court demonstrates, or raises a genuine issue concerning, the existence of a trust relationship involving the Fort Douglas property. When the Government designated boundaries, it did not include Fort Douglas within plaintiff's lands. In 1864 the Government did not include the land within the Uintah Reservation, and in a June 17, 1867 request to confirm the land as a military reservation, the land was referred to as "public domain." Even in the 1849–1861 period, plaintiff has provided insufficient evidence

of a trust relationship as to the subject land. In 1867 Congress denominated the land "public lands." Gen. Order No. 27 (Army H.Q., Asst. Gen. Office Mar. 30, 1887).

**24.** Defendant did not move pursuant to RCFC 12(b)(4) due to reliance on extra-pleading materials; its summary judgment arguments are directed to deficiencies in plaintiff's theories of relief.

IT IS SO ORDERED.

No costs.